In re Dr. Larry N. BURKE, a/k/a L.N. Burke, Lawrence Burke and Susan Burke, Debtors.

Dr. Loye A. ASHTON, Plaintiff,

v.

Dr. Larry N. BURKE and Susan Burke, Defendants.

Bankruptcy No. 87–05518.
Adv. No. 87–7089.

United States Bankruptcy Court,
D. North Dakota.

Feb. 23, 1988.

William E. McKechnie, Williston, N.D., for plaintiff.

John MacMaster, Williston, N.D., for defendants.

## MEMORANDUM OPINION

WILLIAM A. HILL, Bankruptcy Judge.

This adversary proceeding was commenced by a three count complaint filed July 30, 1987, by which the plaintiff, Dr. Loye A. Ashton (Ashton) seeks a determination that the failure on the part of the defendant/Debtors, Dr. Larry N. Burke and Susan Burke, to pay the balance due him in consequence of a contract to purchase his dental practice constitutes a conversion under section 523(a)(6) of the Bankruptcy Code rendering the unpaid balance nondischargeable. Ashton also seeks to bar the Debtors' discharge pursuant to section 727(a)(4) by virtue of the Debtors failure to fully disclose material assets on their petition schedules. Burkes generally deny the allegations. Trial was held before the undersigned on January 27, 1988.

At the close of the plaintiff's case the defendants orally moved for dismissal of the complaint and the court granted the motion as against co-defendant Susan Burke on the section 523(a)(6) action and as against both defendants on the section 727(a)(4) action providing they filed amended schedules within fifteen days that provide complete and detailed answers to all questions posed in the statement of affairs and schedules of assets. Although resolved by the in-court directions, this admonition will be further discussed in the context of this opinion.

### Findings of Fact

1.

The Debtor, Dr. Larry N. Burke (Burke), is a dentist licensed to practice in the State of North Dakota. Sometime during the summer of 1979 he became interested in locating his practice in Williston, North Dakota and discussed purchasing the existing dental practice of Ashton who was an established Williston dentist. Discussions led to a sale of the Ashton dental practice to Burke in June of 1979. It is agreed by stipulation that this sale is evidenced by an agreement denoted as, "sale of dental practice". The dental practice involved was Ashton's general dental practice and carried on in the Hedderich Building, a building owned by a building partnership which included Ashton and in which he also owned and operated a dental lab. It was Ashton's intention to cease general denistry and after the sale, to open a new practice in the same building specializing in prosthetic denistry.

Included in the sale to Burke was, "all dental equipment, all patient records, and the dental practice of the seller". According to the sale agreement, Ashton, as seller, was to turnover to Burke all equipment used in the general practice of dentistry

and that all patient files went with the sale of the business with the exception of Ashton's right to retain ten percent of them. At trial Ashton said the sale included patient dental charts, records, dental equipment, office equipment and supplies—the whole practice. The selling price was $191,249.00 with $10,000.00 due upon signing, $20,000.00 by August 1, 1979, and the balance of $161,249.00 payable over ten years at ten percent in monthly installments of $2,130.90.

No security was taken by Ashton and no security agreement exists between Ashton and Burke in consequence of the sale.

In addition to the equipment purchased from Ashton, Burke purchased new dental equipment installing them in his Hedderich Building dental office.

The agreement provided that, at Burke's option, Ashton would continue in the practice of general dentistry in Burke's office but either could terminate this arrangement upon fifteen days notice.

The office suites in the Hedderich Building are situated in such a way that the office comprising Ashton's general practice and which was sold to Burke was located adjacent to Ashton's dental lab. On the other side of the lab was another office suite eventually used by Ashton himself when he started up his prosthetic specialty. Both dental offices could be accessed from the lab by means of interconnecting doors which were left unlocked.

Although not entirely clear from the evidence, it appears that Ashton established his specialty practice in the adjacent office in January 1980 and that for several months preceding January 1980 he continued to practice general denistry with Burke in the office space comprising the practice sold to Burke.

, After Ashton got his specialty practice underway he and Burke maintained an informal professional relationship referring patients back and forth. Ashton was also Burke's landlord in that Burke was paying rent to Ashton's building partnership. Although Ashton had daily access to Burke's dental office by means of the interconnecting doors and thereby access to Burke's patient files and records, he testified that as a matter of courtesy he would not have just walked in and used the records. According to Burke, Ashton's access to the records was the same as that of any other dentist in the Hedderich Building. By virtue of this access Ashton testified that he had daily control of the patient records, control which he characterizes as a possessory lien.

The parties relationship soured dramatically when Burke failed to maintain either the monthly payments on the dental practice sale or the office lease payments. Efforts to amicably work out their differences failed to such a degree that in the summer of 1985 Burke left the Hedderich Building and reestablished his dental practice in a different Williston office building. He equipped the new dental office with new equipment, leaving the equipment purchased from Ashton in his former Hedderich Building office.

At the time of relocation he had not paid Ashton off and was in arrears on his rent. Without formal eviction process, Ashton attempted to prevent Burke's further access to his dental office in the Hedderich Building by changing the office locks. One evening, Burke, with the assistance of his wife and another person, broke into the Hedderich dental office and removed some small dental implements and approximately 75 to 100 patient files. Except for the files and the small dental implements, all other items of dental and office equipment involved in the original purchase from Ashton were left on the premises and remain there today. The great bulk of the patient files and charts were also left on the premises, however, subsequent to Burke reestablishing his practice in the new location, about 1200 to 1500 files were at the individual patient's request given back to Burke by Ashton.

In explaining the break-in, Burke testified that because he had bought everything comprising Ashton's dental practice, including the files, and because he had not been formally evicted, he felt the office was still his and he was doing nothing wrong in breaking in.

Incensed over these developments, Ashton commenced a state court action against Burke for breach of contract and against another individual for tortious interference and wrongful infliction of emotional distress. After a jury trial held in April 1987, a verdict was returned holding Burke liable for actual and consequential damages stemming from breach of the dental practice purchase contract in the sum of $117,-119.06 inclusive of costs. No recovery was awarded on the other cause of action.

To the extent this dispute is over dental files, charts and records, both dentists agree that such records have a value to a dentist as a means of generating patient business and maintaining patient rapport. Both also concede that the records really belong to a patient in the final analysis and that they are routinely transferred from dentist to dentist according to a patient's wishes. According to Ashton, a single patient record is worth $25.00 to $40.00 in terms of a practice and that patient records and charts comprise the largest portion of a dental practices value.

In addition to his Williston practice, Burke has a one-half interest in a dental practice situated in New Town, North Dakota.

A petition for Chapter 7 relief was filed on May 29, 1987, listing debts of $506,-000.00 and assets of $169,000.00.

On Schedule B–2, requiring a listing of personal property and its value, without deduction for secured claims against it, the Debtors omitted any inclusion for:

"(l) Inventory, (m) Tangible personal property of any other description, (p) Other liquidated debts, or (u) Interest in partnerships".

Indeed their Schedule B–2 is entirely devoid of any information at all for categories (1) through (v). At trial Burke acknowledged the New Town practice could be sold for a much as $150,000.00 but as with any dental practice its value depends on the market. Schedule B–2 depicts the value of his one-half interest of the New Town practice as being $4,500.00 despite its purchase in 1980 for $20,000.00 inclusive of equipment and patient charts. No separate value at all was placed on the Williston practice despite the fact that the practice was purchased from Ashton in 1979 for nearly $200,000.00. Burke testified that the value of $46,000.00 placed on "(j) Office equipment, furnishings and supplies" is a value inclusive of the Williston practice and that it relates to anything having to do with the business of denistry.

### Conclusions of Law

1.

■ Although Ashton's cause of action seeking denial of discharge under section 727(a)(4) was orally dismissed at trial, the remarks made at trial are deserving of amplification. Section 727, in part, provides:

> (a) The court shall grant the debtor a discharge, unless ...
>
> (4) the debtor knowingly and fraudulently, in or in connection with the case
>
> ...
>
> (A) made a false oath or account;
>
> \*　　\*　　\*　　\*　　\*　　\*

Denying discharge to a debtor is a serious matter not lightly taken by a court. Each of the provisions of section 727 affording an objecting party this drastic remedy are construed liberally in favor of the debtor and strictly against the objecting creditor. *In re Shapiro*, 59 B.R. 844 (Bankr.E.D.N.Y.1986). Two elements must be present to deny a discharge under section 727(a)(4)(A). The debtor's oath must have been knowingly and fraudulently made and it must have related to a material fact. *In re Butler*, 38 B.R. 884 (Bankr.Kan.1984). Section 727(a)(4)(A) relates to the fundamental necessity in bankruptcy that statements on schedules supplied by a debtor in connection with his petition be accurate and reliable. The debtor has a paramount duty to consider all questions posed on a statement or schedule carefully and see that the question is answered completely in all material respects. An omission of a non-material fact or an omission caused by a mistake or inadvertence are not sufficient grounds for denial of discharge under section 727(a)(4)(A). *In re McDonald*, 50 B.R. 255

(Bankr.N.D.Ga.1985). Under section 727(a)(4)(A) fraudulent intent must be established on the part of the debtor—intent which has been defined as "an actual intent to hinder, delay or defraud one's creditors." *In re Topper*, 229 F.2d 691, 692 (3rd Cir.1956); *In re Cohen*, 47 B.R. 871, 875 (Bankr.S.D.Fla.1985). Expressed another way, other courts have said it must appear that the debtor knowingly made a false statement under oath with the intent to defraud his creditors regarding a matter material to the administration of the estate. *Matter of Hussan*, 56 B.R. 288, 290 (Bankr. E.D.Mich.1985); *In re Hooper*, 39 B.R. 324 (Bankr.Ohio 1984). The language of the schedules as well as the statement of affairs is clear and easy to both read and understand. The schedules of assets ask for information on all property whether specifically enumerated or not. The questions posed on the schedules are meant to be inclusive of all legal or equitable interests held in property as of the commencement of the bankruptcy case consistent with section 541(a)(1). Section 541(a)(1) is a broad provision which encompasses all apparent interests of the debtor. *In re Graham*, 726 F.2d 1268, 1271 (8th Cir.1984). It is not for debtors to pick and choose which questions they feel like answering or whether they are going to answer them at all. A debtor has a duty to disclose whatever ownership interest is held in property. It is the debtor's role to simply consider the question carefully and answer it completely and accurately. *In re Gugliada*, 20 B.R. 524, 528 (Bankr.S.D.N.Y.1982).

Determination of the existence and nature of a debtor's legal or equitable interest in property is made with reference to state law. *In re Davison*, 738 F.2d 931 (8th Cir.1984); *In re Wolsky*, 53 B.R. 751 (Bankr.D.N.D.1985). Reference to state law is made at this juncture because of the argument concerning the value to be placed on patient files and records. Burke, as a dentist with substantial ongoing practice in several locations, had at the time of case commencement in May 1987 an interest in both practices which must be characterized as property of the estate under section 541 to the extent the practices have value inde-

pendent of Burke's personal involvement. In North Dakota the value of a professional practice at a minimum includes office equipment, furniture, fixtures and accounts receivables as they existed on the day of petition filing. *Bard v. Bard*, 380 N.W.2d 342 (N.D.1986); *Fraase v. Fraase*, 315 N.W.2d 271 (N.D.1982). To the extent that a dental practice consists of the personal services of the dentist himself, that practice has no value either under North Dakota law or bankruptcy law for the reason that personal services do not constitute estate property and are regarded by North Dakota courts as being entirely too speculative to be valued. *Sanford v. Sanford*, 301 N.W.2d 118 (N.D.1980). The extent to which patient files by themselves ought to be factored into the value of an ongoing dental practice is difficult to ascertain and this court is not, in the context of this opinion, about to place a value on the files in question. However, several observations regarding patient files will be made. Although a patient is free to move his business to another dentist, it would seem, particularly in a small locale that a patient would continue visiting the dental office he's familiar with and to that extent the retention of patient files by a dentist who has purchased an existing practice has value as a ready-made patient base. Obviously, when Burke purchased Ashton's practice in 1979 for nearly $200,000.00 he was paying for an existing practice including a patient base as opposed to merely purchasing a room full of equipment. It is patient records that form the core of an existing practice and both parties have admitted that patient files have a definite value to a dentist. It may be true, as Burke suggested at trial, that patient records and files have no value unless someone wishes to purchase them; ergo, a existing dental practice has no value unless someone wishes to purchase it. However, the evidence does not establish that there is no market for a dental practice in either the Williston or New Town area. The evidence is inconclusive as to precisely what the value of Burke's dental practice is in either location but to the extent it has value exclusive of his personal services, it must be

listed on Schedule B-2. Given the difficulty courts themselves have in valuing professional practices, this court is satisfied that the Debtors' failure to properly complete their schedules was due to confusion or lack of understanding rather than an intent to omit relevant data. For this reason the Debtors were accorded leave to amend their schedules.

Section 523(a)(6) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

Although the foregoing section does not make any specific reference to the conversion of property, courts have held that Congress intended to include within the section the willful and malicious conversion of property. *In re Graham*, 7 B.R. 5 (Bankr. Nev.1980). Although variously defined by different courts, the definition of conversion is generally the wrongful assumption of dominion over personal property by one person to the exclusion of possession by the owner in repudiation of the owner's rights. *In re Wightman*, 36 B.R. 246, 252 (Bankr.D.N.D.1984). This definition meets that of theft as enunciated in North Dakota Century Code § 12.1–23–02.[1]

A conversion to be actionable under section 523(a)(6) must be both willful and malicious. Proof of one without the other will not support a claim under the section. *In re Vandrovec*, 61 B.R. 191 (Bankr.D.N. D.1986); *In re Clark*, 50 B.R. 122 (Bankr. D.N.D.1985). The standard of proof in section 523 actions is one of clear and convincing, not the lesser standard of fair preponderance, *In re Clark*, *supra*, notwithstanding. *Clark* incorrectly states the standard and in doing so is contrary to other deci-

sions of this court. *See In re Wightman, supra; In re Perrin*, 55 B.R. 401 (Bankr.D. N.D.1985); *In re Mutschler*, 45 B.R. 482 (Bankr.D.N.D.1984). The better reasoned cases opt for a clear and convincing standard for the reason that exceptions to discharge must be strictly construed against creditors and in favor of debtors. *American Honda Finance Corp. v. Loder*, 77 B.R. 213 (Bankr.N.D.Iowa 1987).

The recent Eighth Circuit decision of *In re Long*, 774 F.2d 875 (8th Cir. 1985) has made it clear that the elements of willfulness and malice as used in section 523(a)(6) are two distinct characteristics which should not be lumped together but which should be analysed separately. The element of willfulness simply means a deliberate or intentional action as opposed to one occurring by reason of negligence or accident. The presence of malice is more difficult to discern. As an element of proof in section 523(a)(6) actions, malice goes beyond mere willfulness and requires a higher degree of culpability. It must tend toward conduct which is targeted at the creditor at least in the sense that the conduct is certain or almost certain to cause the creditor harm.

It is with the foregoing standards in mind that the facts of this case are reviewed.

The plaintiff's section 523(a)(6) cause of action seems to spring from two unrelated sources. By his complaint Ashton asserts that the Debtors' failure to pay the balance remaining due on the dental practice purchase contract constitutes conversion and the state court judgment is res judicata on the issue of dischargeability. The state civil action resulting in the judgment is claimed by Ashton in his brief to have arose out of Burke's breaking into the Hedderich Building dental office and taking away the patients' records and charts—

---

1. N.D.Cent.Code § 12.1–23–02 "Theft of Property. A person is guilty of theft if he: (1) knowingly takes or exercises unauthorized control over, or makes an unauthorized transfer of an interest in, the property of another with intent to deprive the owner thereof; (2) knowingly obtains the property of another by deception or by threat with intent to deprive the owner thereof, or intentionally deprives another of his property by deception or by threat; or (3) knowingly receives, retains, or disposes of property of another which has been stolen, with intent to deprive the owner thereof."

action, which Ashton claims, amounts to a conversion.

■■ The Supreme Court in *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979) made it clear that state court judgments have no res judicata effect in determining whether a debt is dischargeable in bankruptcy. Dicta in *Brown* suggested, however, that the doctrine of collateral estoppel might well apply in situations where a state court had decided factual issues identical to those which would pertain to the issue of dischargeability. In order for collateral estoppel to apply, the factual basis for a state court's findings must be clear from the state court records and the standards used must be clearly the same as those required by the Bankruptcy Code. *Klingman v. Levinson*, 831 F.2d 1292 (7th Cir.1987); *Spilman v. Harley*, 656 F.2d 224 (6th Cir.1981). The following criteria have been implemented by this court for determining whether the doctrine of collateral estoppel is to have any preclusive effect in a particular case:

1. The issue sought to be precluded must be the same issue as that involved in the prior action;
2. The issue must have been actually litigated;
3. The issue must have been determined by a valid and final judgment; and
4. The determination of the issue must have been essential to the final judgment.

*See In re Fercho*, 39 B.R. 764 (Bankr.D.N.D.1984); *In re LaCasse*, 28 B.R. 214 (Bankr.Minn.1983).

■■ The results in the state court action appear to have little to do with conversion. Indeed, the gist of the action is breach of contract. The jury instructions bear heavily on the nature of a contract and its breach and the jury's special verdict specifically found there to be a breach of the dental purchase contract for which damages were awarded. Moreover, the jury reached its decision by means of the lesser proof standard of preponderance of the evidence rather than the clear and convincing standard. From the nature of the state court action and the jury verdict, this court concludes that the state court action had no bearing at all on issues critical to a finding of conversion under section 523(a)(6).

■■ Ashton's argument for section 523(a)(6) nondischarge goes beyond the entry of the state court judgment. It is his position that subsequent to selling his practice to Burke he maintained a vendor's lien on all patient files sold as a part of the practice by virtue of N.D.Cent.Code § 35–20–05. The lien available under section 35–20–05 is fully dependent upon possession. The statute provides as follows:

> One who sells *personal* property has a special lien thereon, dependent upon *possession*, for its price, if it is in his possession when the price becomes payable, and may enforce his lien in like manner as if the property were pledged to him for the price. (emphasis added).

Ashton believes his possession while not exclusive before Burke's break-in was sufficient for purposes of maintaining a vendor's lien under section 35–20–05. Subsequent to changing the locks, Ashton asserts his possession was exclusive and that Burke, by breaking in, converted the files and charts.

The term "possession" is not defined in the statute itself but in the case of *Rosenbaum v. Hayes*, 8 N.D. 461, 79 N.W. 987 (N.D.1899), the North Dakota Supreme Court considered the requirements for maintaining a factor's lien based upon the language of Section 4442 of the 1887 Compiled Laws of the Territory of North Dakota. Section 4442 then under consideration is identical to section 35–20–06 of the North Dakota Century Code, comprising the present factor's lien statute which provides that a right to a factor's lien is "dependent upon possession". The *Rosenbaum* court said that although a "factor's possession must be exclusive", it does not need to be actual and personal. *Id.* at 79 N.W. 992. The *Rosenbaum* court, in analogizing New York's factor's lien law to North Dakota's, quoted a New York case which defined "possesion" as "such control of, or dominion over, merchandise as enables a factor

rightfully to take it into actual custody without the aid of any new authority or document furnished by the owner". *Id.* at 992. The Supreme Court of Minnesota reached a similar conclusion in holding that the key to maintaining the validity of a possessory lien is to maintain control and keep lawful possession out of the hands of the debtor. *See Woodland Co. v. Mendenhall,* 82 Minn. 483, 85 N.W. 164, 167 (1901):

It is not necessary, to give validity to such a lien, that the person entitled thereto retain at all times, and from all persons, the actual physical possession of the property. It is sufficient that he retain such possession as will preserve in him the actual control of the property. He may permit a third person to take and hold possession, but so long as he does not lose control of it, and the property does not reach the possession of the debtor, it remains impressed with the lien.

85 N.W. 164, 167.

■ Based upon the foregoing, this court is of the opinion that were the North Dakota Supreme Court called upon to define the term "possession" in the context of section 35–20–05, it would follow its definition of possession in the similar context of a factor's lien and conclude that constructive possession or control is to be considered in determining whether or not a lien holder has retained control of the property upon which the lien has attached. From the facts of the case at bar, the court concludes that Ashton did not retain a possessory vendor's lien in the patient files and records because possession and control was effectively surrendered to Burke at the time of sale with Ashton merely retaining a right to refer to them only as a consequence of normal professional courtesies extended between dentists.

■ The self help Ashton exercised by changing the locks on Burke's Hedderich Building offices could be regarded as a lock-out by a landlord but it cannot be considered a valid means for the recovery of personal property. Under North Dakota law Ashton could have validly assumed possession of the property sold to Burke only by means of a claim and delivery action as provided by N.D.Cent.Code ch. 32–07, by pre-judgment attachment as provided for by N.D.Cent.Code ch. 32–08, or by post-judgment execution as permitted by N.D.Cent.Code ch. 28–21. None of these remedies afford an unsecured creditor without possession the right to surreptitiously lay claim to property which he earlier sold. The strongest legal remedy that was available to Ashton was immediate pre-judgment delivery without notice but even this remedy does not afford possession unless very precise steps are followed and a sufficient showing is made to a court. *See* N.D.Cent.Code § 32–07–02. Pre-judgment seizure of a person's property before there has been a determination of the underlying claim and before the debtor has had an opportunity to be heard on the merits of the underlying claim is regarded by the North Dakota Supreme Court as a drastic remedy, the granting of which demands the utmost caution and sensitivity. *Production Credit Ass'n. v. Halverson,* 386 N.W.2d 905 (1986). Should Ashton's self help repossession effort be regarded as any less drastic or any less worthy of caution and sensitivity than if he had used recognized legal methods? This court thinks not. Prior to obtaining possession of the files by one of these legally recognized proceedings, Ashton's claim to possession of the patient files and records was without legal foundation. Burke remained the owner of the patient files and records at all times and his action of breaking in to the Hedderich Building offices and removing the files resulted in removal of property belonging to himself. His efforts to take possession of what was his was not contrary to or in repudiation of any interest of Ashton's. Burke's action was not malicious in that it was not directed at Ashton but rather, was carried out in exercise of a rightful dominion over his own property. At the time Ashton merely had an unliquidated claim for breach of contract—a claim which was not reduced to judgment until 1987 and a claim upon which no legally recognized pre-judgment methods to effect repossession were put into effect.

The court concludes that Ashton has fully failed in the proof necessary to a finding that his claim is nondischargeable under section 523(a)(6). Therefore, and for the reasons set forth herein, it is the decision of this court that the complaint of Dr. Loye A. Ashton based upon section 523(a)(6) and upon section 727(a)(4) be and is hereby dismissed. Any indebtedness remaining to Ashton by Dr. Larry N. Burke in consequence of the breach of the dental purchase contract is an unsecured claim subject to discharge.

SO ORDERED.