**In re Lyle LUNDAY and Audrey Lunday, Debtors.**

**Phillip D. ARMSTRONG, Trustee of the Estates of Lyle Lunday and Audrey Lunday, Plaintiff,**

**v.**

**Lyle LUNDAY and Audrey Lunday, Defendants.**

**Bankruptcy No. 88–05563.
Adv. No. 88–7124.**

United States Bankruptcy Court,
D. North Dakota.

April 19, 1989.

Phillip D. Armstrong, Minot, N.D., for plaintiff.

Michael Ward, Minot, N.D., for defendants.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

On September 26, 1988, the trustee, Phillip D. Armstrong, filed an objection to the Debtors' claim of homestead exemption in certain property and subsequently commenced an adversary proceeding seeking to deny the Debtors a discharge. By amended Complaint filed January 9, 1989, the trustee seeks a denial of discharge pursuant to section 727(a)(2), (a)(3), (a)(4) and (a)(5) alleging that the Debtors gave false testimony at the first meeting of creditors, fraudulently converted non-exempt assets into exempt assets and otherwise concealed assets. By agreement, trial of the adversary proceeding and hearing on the related exemption objection were jointly held on March 27, 1989. This memorandum will address both.

### FINDINGS OF FACT

#### 1.

The Debtor, Lyle Lunday, and his wife, co-Debtor Audrey Lunday, reside in Minot, North Dakota. From 1973 to June 1988 Lyle was engaged in the beekeeping business maintaining hives in North Dakota as well as the state of Texas. He quit this business when drought conditions made it unprofitable. Audrey is a college professor employed by Minot State College. They filed a petition under Chapter 7 on July 11, 1988, and in Schedule B-2 in response to question (a) list no cash on hand or on deposit with any bank or anyone else except for $10.00 at First American Bank and $10.00 at Norwest Bank. Likewise, they answered "none" in response to question B-2(g) regarding contingent and unliquidated claims; and to question B-3(b) regarding property of any kind not otherwise scheduled. No liquidated debts were listed in response to question B-2(p) except for $250.00 due from Sioux Honey Association.

They indicate "none" in response to question B–2(q) which requests the nature and value of contingent and unliquidated claims of every nature. In response to questions B–2(h), (i), (j), (k), (*l*), (m), and (s), no livestock, farm equipment, machinery, fixtures, supplies, inventory, annuities or property of any other description are listed except for one Apple computer, 1800 hives and a 1960 Ford truck. After trial of this matter, the Debtors, on April 4, 1989, filed amended B–2 and B–4 schedules wherein they now list $21,000.00 due from Sioux Honey Association in response to question B–2(p) and list an $80,000.00 teacher pension fund annuity in response to question B–2(s).

Listed as exempt homestead property on schedule B–4 is a house situated at 2513 West Central Avenue in Minot, North Dakota. The circumstances of its purchase are detailed below.

## 2.

The house on West Central was purchased with cash on Friday, July 8, 1988, and the Debtors assumed possession on Saturday, July 9, 1988. Their bankruptcy petition was filed the following Monday. Prior to purchasing that house on West Central they had maintained a house at 2119 Fifth Avenue Southwest in Minot which was foreclosed upon on January 19, 1988, the six month redemption period expiring on July 19, 1988.

In June 1988, the Debtors, through a realtor, located the West Central house and arranged for its purchase. According to testimony by both the Debtors given at the first meeting of creditors, the $58,000.00 purchase price was paid for principally by means of cash the Debtors kept stashed in various locations. They said that except for $5,600.00 in U.S. Bonds, the rest of the money was cash kept in vehicles, in their house, or on Lyle's person. Lyle stated that at least $5,000.00 in cash was kept in the glove compartment of a Volkswagon Rabbit and more cash was kept under the floor mat of his 1980 Ford truck while still more was kept in a sack behind the seat of the truck. They said further, that quite a

lot more than $5,000.00 was kept in the drawers of two dressers in their bedroom and as much as $20,000.00 cash was kept in Lyle's right front pocket. According to Lyle's first meeting testimony, for years he has kept large cash sums in his pocket and on the day of the house purchase had over $15,000.00 in his pocket. According to the Debtors, they kept great piles of cash in the house which they would measure from time-to-time by means of stick or a ruler. From these various sources a pile was put together and taken to the bank in payment of the house on West Central. In fact, this is all nonsense. At trial Mavis Sandstrom, the loan closing officer at Norwest Bank, testified that the house was paid for by means of two cashier's checks of $10,000.00 each issued by East Texas State Bank, a cashier's check of $13,399.06 issued by First American Bank and Trust, $5,633.95 in U.S. Bonds and $18,943.99 in cash. An officer of First American Bank and Trust of Minot testified at trial that on the day of the house closing Lyle purchased the cashier's check from his bank by means of a $1,000.00 check from Sioux Honey Association payable to Lyle Lunday, a $5,239.34 check from Sioux Honey Association, and a $7,159.72 wire transfer from East Texas State Bank. Despite persistent questioning from the trustee as well as an Assistant United States Attorney, the Debtors, at the first meeting of creditors, never revealed the fact that a bank account had existed at the East Texas State Bank or that the bank had been the source of $27,-159.00 of the purchase funds. A deposit slip from East Texas State Bank revealed that on April 7, 1988, Lyle made a deposit of two checks totaling $30,903.47. One must conclude that East Texas State Bank and not Lyle's right front pocket was the principal repository of the Debtors' cash assets. The Debtors also carefully avoided mentioning Sioux Honey Association as the source of $6,239.34 of the home's purchase price.

Despite repeated and unwavering assertions at the first meeting that the payment was largely made with cash from stashes; at trial Lyle said that his reference to cash meant to include cashier's checks which, in

his opinion, were the same as cash. This belated equivocation does not square with the Debtors' previous statements that they had for years kept large amounts of cash around the house, in vehicles and in Lyle's pockets. Obviously three cashier's checks totaling over $33,000.00 obtained on July 8, 1988, could not have been part of a large and long existing stash that was so large it had to be measured with a stick!

According to the Debtors first meeting testimony, the pile of cash used to purchase the house came in part from a 1979 flood insurance settlement on damage to their former house. During the trial it was confirmed that the former house did suffer flood damage for which National Flood Insurers paid $19,943.45 by means of two checks, one in the sum of $12,420.75 for damage to the dwelling which was jointly issued to Lyle and the mortgagee, Midwest Federal. Officers from Midwest Federal testified they never signed off on the check and received none of the proceeds. Under the Debtors' version of the facts, the flood insurance proceeds apparently remained in Lyle's pocket or in other stashes for nearly ten years until used for purchase of the house on West Central.

### 3.

Lyle had sold honey to Sioux Honey Association for some time and on June 27, 1988, received a check from them in the sum of $4,999.00. This check was cashed on the same date with the cash, according to Lyle, being put in his pocket and used for expenses. At trial the only specific expenditure he could recall was putting brakes and a clutch in his truck. Yet twelve days later when he signed schedule B–2 on July 9, 1988, the only cash listed is $20.00 on deposit in several banks.

In evidence is a statement of account from Sioux Honey Association for the year ending June 30, 1988. Also received in evidence is a statement of quarterly activity for the period ending August 15, 1988, as well as a statement of account for the 1987 honey crop. From these documents it appears that on July 5, 1988, a check in the sum of $1,000.00 was issued to Lyle; on July 7, 1988, he was issued a check for $5,239.34 and on August 15, 1988, he was issued a further check for $2,380.40. Beyond a trial statement that money was used for expenses and minor car repair no other explanation of what became of this money was given by the Debtors. Apparently, according to bank officer testimony, the $1,000.00 and $5,239.34 checks were used to buy the cashier's check. The financial documents of Sioux Honey Association further indicate that for the quarter ending August 15, 1988, Lyle had a payable balance of $38,895.39. The foregoing checks as well as balance due all stem from the Debtors' 1987 honey crop and had accrued as of August 15, 1988. Moreover, from the various ledgers it appears that all honey had been delivered to the association prior to the date of petition filing. No deliveries are indicated for the period July 1, 1988, to August 15, 1988. Thus, the court believes that all sums due the Debtors for the quarter ending August 15, 1988, had accrued at the time of petition filing.

In addition, Sioux Honey Association has credited Lyle with one membership certificate worth $25.00, three participation certificates valued at $6,760.91, seven certificates of interest valued at $14,390.97 plus an interest in its capital equity fund worth $8,996.11. At trial Lyle explained that he failed to list the Sioux Honey Association account balance and credits on his schedules because he did not think of them as assets of the bankruptcy estate. When asked what became of the post-petition Sioux Honey payment he said he used it to live on.

### 4.

The schedules omit any reference to a 1980 Freightliner semi-tractor and a forklift. Also omitted were 6,000 pallets and a honey extractor. At the first meeting of creditors held in September 1988, Lyle acknowledged the existence of these items saying the Freightliner and forklift were worth apparently $14,000.00 and had been left on a rural trail north of Orange Texas. The pallets worth $9,000.00 were at his shop in Valley City, North Dakota. These

items were pledged to the Small Business Administration as partial security for a $200,000.00 loan upon which there remains an unsatisfied balance of about $100,-000.00. SBA was unsuccessful locating the Texas equipment until Lyle was prodded to provide further locating information at a continued meeting of creditors held in November 1988.

The original schedules as well as the recent amendments list no bees but do list 1800 hives. Lyle's testimony was obfuscating regarding the exact number and location of the hives. At the first meeting he originally said all hives were in North Dakota but in the later continued first meeting said he had 100 hives in Texas. In fact 150 hives were left with an individual in Texas named Dan Gunter and another 148 were left at three other locations—these were in addition to the 100 Lyle testified to. At trial, an officer of SBA stated that they had located 600 hives in North Dakota and 238 in Texas. The number of hives accounted for thus far is far short of the 1800 listed on the schedules. At trial Lyle said the figure of 1800 was not his and that he did not know where it came from—inferring that the figure of 1800 is incorrect. Curiously, the same figure is on the April 4, 1989, amended schedule B–2.

## CONCLUSIONS OF LAW

### 1.

■ The Code provisions upon which the trustee bases his case are sections 727(a)(2); 727(a)(3); 727(a)(4) and 727(a)(5). These sections provide:

(a) The court shall grant the debtor a discharge, unless—

\* \* \* \* \* \*

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

(B) presented or used a false claim;

(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

(D) withheld from an offer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

\* \* \* \* \* \*

Each of the foregoing provisions of section 727, affording a trustee the drastic remedy of nondischarge, are construed liberally in favor of the debtor and strictly against the trustee with the burden resting upon the trustee to prove each element by clear and convincing evidence. *Boyle v. Abilene Lumber, Inc.,* 819 F.2d 583, 588 (5th Cir. 1987); *In re Montgomery,* 86 B.R. 948, 955 (Bankr. N.D.Ind.1988); *In re Shapiro,* 59 B.R. 844 (Bankr. E.D.N.Y.1986).

■ Beyond denial of discharge, the trustee, per his objection to exemptions, seeks disallowance of the Debtors' homestead exemption, charging that it was created by the fraudulent conversion of nonexempt property into exempt property.

The rule, while not absolute, is that a debtor's conversion of non-exempt property to exempt property on the eve of bankruptcy even if done for the express purpose of placing it beyond the reach of creditors, will not deprive the debtor of the exemption unless such transfer was done with the actual intent to hinder, delay or defraud creditors in violation of section 727(a)(2). *Norwest Bank Nebraska, N.A. v. Tveten,* 848 F.2d 871 (8th Cir.1988); *Hanson v. First Nat. Bank in Brookings,* 848 F.2d 866 (8th Cir.1988); *In re Carey,* 96 B.R. 336 (Bankr. W.D.Okla.1989). Courts, in looking beyond the mere fact of an exemption creation, have come to consider whether the circumstances bear certain indicia or "badges of fraud". These indicia include:

(1) An absence of or negligible amount of consideration;

(2) The debtor and the transferee enjoyed a family, friendship, or other close relationship;

(3) The debtor retained possession, benefit or use of the property in question;

(4) The debtor engaged in a sharp pattern of dealing immediately before the bankruptcy;

(5) The conversion occurred after the entry of a large judgment;

(6) The concealment of the transfer.

*In re Fine,* 89 B.R. 167, 174 (Bankr. Kan. 1988); *In re Peery,* 40 B.R. 811, 815 (Bankr. M.D.Tenn.1984); *In re Rubin,* 12 B.R. 436, 442 (Bankr. S.D.N.Y.1981). Our Circuit in *Tveten, supra,* suggests as an additional indicia of fraudulent intent, the use of an unrestricted state exemption statute beyond what would be regarded as reasonably necessary to protect the family and avoid impoverishment. *Tveten* at 875–876. In the case at bar the Debtors transferred cash assets, which for the most part would have been non-exemptible, into a house occupied by them as a homestead and thereby created for themselves and their family a homestead exemption which, under North Dakota law, has a dollar ceiling of $80,000.00. N.D. Cent.Code § 47–18–01. The Debtors, by moving $58,000.00 into the homestead exemption are well under the statutory dollar limit and achieve for their family the preservation of a homestead. This result comports with the objective of bankruptcy law that of affording a debtor a "fresh start" and preserving for them one of the necessities of subsistence. Hence, the effort to shield $58,000.00 does not go beyond the purpose for which exemptions are permitted. Although the Debtors were not honest with the trustee in revealing to him the sources of the cash used to fund the homestead property, they did not conceal the fact of the transfer itself. The fact that the transfer may have been made with the express purpose of removing funds from the reach of SBA and other creditors is not enough to render the exemption infirm. The court does not believe the transfer was accompanied by the requisite intent to hinder, delay or defraud creditors necessary to the disallowance, accordingly the Debtors may retain their claim of a homestead exemption in the property located at 2513 West Central Avenue, Minot, North Dakota.

Section 727(a)(2), in addition to proscribing fraudulent transfers, also operates to deny a discharge where the debtor has falsely and fraudulently concealed assets from the trustee. This aspect of the trustee's case is discussed below.

2.

Section 727(a)(2) as well as sections 727(a)(3), (a)(4), and (a)(5) relate to the debtor's duties as set forth in 11 U.S.C. § 521 and § 343. Among the duties imposed by section 521 is the responsibility of filing a schedule of assets and liabilities; cooperation with the trustee as necessary to enable him to perform his duties; and the surrender to the trustee of all property of the estate including any records. Section 343 requires the Debtors to appear at a first meeting of creditors and submit to examination under oath on any matter relating to the acts, conduct, property, liabilities and financial condition. Here the Debtors stumble.

Section 727(a)(3), (a)(4) and (a)(5) deal with the fundamental necessity in bankruptcy that statements and schedules filed pursuant to section 521 be accurate and reliable and that the debtor answer the trustee's first meeting inquiries in a thorough, non-evasive manner. *In re Burke,* 83 B.R. 716, 720 (Bankr. D.N.D.1988). If

made with the requisite fraudulent intent, a false statement, whether made in the schedules or orally at a section 341 examination is sufficient ground for denying a discharge providing it was knowingly made and is material. *In re Braidis*, 27 B.R. 470 (Bankr. E.D.Pa.1983). A statement is "material" if it bears a relationship to the debtor's business transaction, or estate, or concerns the discovery of assets, business dealings or the existence and disposition of his property. *In re Chalik*, 748 F.2d 616, 618 (11th Cir.1984). Closely related to the obligation of forthright disclosure is the requirement that no property be concealed from the trustee.

 The purpose of these requirements is to insure that those interested in the case, in particular the trustee, have accurate information upon which they can rely without having to dig out the true facts or conduct examinations. *Matter of Hussan*, 56 B.R. 288 (Bankr. Minn.1985); *In re MacDonald*, 50 B.R. 255 (Bankr. Mass.1985). A debtor has an uncompromising duty to disclose whatever ownership interest he holds in property. It is the debtor's role to simply consider the question carefully and answer it completely and accurately. *In re Gugliada*, 20 B.R. 524, 528 (Bankr. S.D.N.Y.1982). Even if the debtor thinks the assets are worthless he must nonetheless make full disclosure. *In re Alfonso*, 94 B.R. 777, 80 B.C.D. 1189 (Bankr. S.D.Fla.1988). In completing the schedules it is not for the debtor to pick and chose which questions to answer and which not to. Indeed, the debtor has no discretion—the schedules are to be complete, thorough and accurate in order that creditors may judge for themselves the nature of the debtor's estate. *In re Chalik*, supra.

 While section 727(a)(5) affords a debtor the opportunity to offer explanation of any schedule omissions or deficiencies, vague, indefinite and uncorroborated explanations are regarded as unsatisfactory. *In re Reed*, 700 F.2d 986 (5th Cir.1983); *Baum v. Earl Millikin, Inc.*, 359 F.2d 811 (7th Cir.1966).

 In the case at bar the Debtors' original schedules are so devoid of accurate information as to be essentially worthless. Moreover, when repeatedly questioned by the trustee at the first meeting regarding the source of cash used to purchase the homestead, both Debtors gave evasive and foolish answers. Rather than being forthright about the method used to consummate the purchase, they outright lied to the trustee, telling him they kept large piles of cash in vehicles and in pants pockets. The trustee as a consequence, was forced to conduct what would have been a wholly unnecessary investigation into the sources of the cash. Even more irresponsible was the failure by the Debtors to list any substantial cash assets, liquidated debts, unliquidated claims or other property. At the time of completing the schedules, Lyle, who had a long relationship with Sioux Honey Association, had knowledge of a sizeable outstanding payment balance as well as considerable equity interest in the association. Again, as with the cash sources, rather than reveal this information or provide the trustee with documentation, the Debtors remained silent apparently satisfied that no one would stumble upon the correct information. Lyle's only explanation for the omission was that he did not think either the money or the Association account was an estate asset. Similarly, with regard to nearly $14,000.00 worth of equipment omitted from the schedules, Lyle cavalierly said he left it uninsured on a trail in Texas. The language of question B–2(f) is easy to read and unmistakable in its request for a listing of "automobiles, trucks, trailers and other vehicles". All other B–2 questions are couched in similar simple language.

As with transfers under section 727(a)(2), any concealment of assets under section 727(a)(2) or false oath under section 727(a)(4) must have been done with the requisite fraudulent intent. Although proof of actual intent is required, it may be established by use of objective information. *In re Long*, 774 F.2d 875, 881 (8th Cir. 1985). Whether advanced under section 727(a)(2) or (a)(4), actual intent requires essentially the same element of proof which may be established by the cumulative effect of the facts which evinces a

pattern of conduct on the part of the Debtor intending to hinder, delay or defraud creditors.

Bankruptcy is a serious matter and when one chooses to avail himself of the benefits of Chapter 7 relief he assumes certain responsibilities, the foremost being to fully disclose his assets and to cooperate fully with the trustee. The manner in which the Debtors completed their schedules coupled with their testimony, both at the first meeting of creditors and at trial, convinces the court that in both instances they were outright and intentionally dishonest, intending thereby to hide nonexempt assets from the trustee and creditors.

Accordingly, and consistent with the foregoing discussion, IT IS ORDERED that the trustee's objection to exemption is DENIED; that judgment be entered denying Lyle Lunday and Audrey Lunday a discharge pursuant to sections 727(a)(2), 727(a)(4) and section 727(a)(5).

SO ORDERED.

LET JUDGMENT BE ENTERED ACCORDINGLY.