In re David C. WIGHTMAN, Debtor.

REITEN EQUIPMENT, INC., a corporation; and Donald Reiten, Plaintiffs,

v.

David C. WIGHTMAN, Defendant.

Bankruptcy No. 81–05293.
Adv. No. 81–7176.

United States Bankruptcy Court,
D. North Dakota.

Jan. 4, 1984.

Jon R. Brakke, Fargo, N.D., for plaintiffs.

Jay D. Carlson, Fargo, N.D., for defendant.

## MEMORANDUM OPINION

WILLIAM A. HILL, Bankruptcy Judge.

This adversary proceeding was commenced by the Plaintiffs, Reiten Equipment, Inc. ("REITEN, INC.") and Donald Reiten ("REITEN") on September 22, 1981, which in three counts seeks to have various debts declared non-dischargeable under sec-

tion 523(a)(2), 523(a)(4) and 523(a)(6) of the Code for the reason that said debts arose by virtue of a clear and continuous course of fraudulent conduct on the part of the Defendant, David C. Wightman ("WIGHTMAN"), during his association with Reiten, Inc. Specifically, the instances giving rise to fraudulent conduct and the amounts misappropriated thereby are alleged as follows: A. Fraud occasioned by Wightman's failure and refusal to assume Reiten, Inc.'s SBA loan; B. Embezzlement of $6,000.00 by writing numerous checks in amounts in excess of COD invoices and misappropriating the excess amount to Wightman's own use; C. Wilful and malicious injury to inventory belonging to Reiten, Inc. by disposal of that inventory at less than fair market value and misappropriation of proceeds of $50,000.00 to Wightman's own use; D. Fabricating a false retail equipment contract and conversion by Wightman of a $30,000.00 check issued to Reiten, Inc. by the credit corporation which action constituted false representation and actual fraud; E. False endorsement of an Allis-Chalmers check in conversion of the $34,447.00 proceeds by Wightman. The case was tried on November 7, 1983.

After the presentation of testimony and new consideration of the pleadings, briefs and documentary evidence, the Court finds the relevant facts to be as follows:

## FINDINGS OF FACT

1. Reiten Equipment, Inc. was a family-owned corporation situated in West Fargo, North Dakota, engaged in the sale of farm and agricultural equipment including products of Allis-Chalmers and Sperry New-Holland.

Reiten, Inc. was financed principally by the Small Business Administration who held as security all the business assets. The land upon which Reiten, Inc. maintained its business was owned by Reiten and his wife, Alma Reiten. Reiten, Inc. was put into involuntary bankruptcy on July 21, 1980, and its estate was closed on November 20, 1981.

Wightman began his association with Reiten, Inc. in March of 1978 when he was employed as bookkeeper for the company, his duties including all bookkeeping and accounting functions. In early 1979, he assumed additional duties and essentially became general manager of the company. There was never any employment contract or other written agreement regarding Wightman's conditions of employment or duties. As general manager he was given check writing authority although Reiten, Alma Reiten and Kirk Reiten also had check writing privileges. In February and March of 1980, Wightman and Reiten held discussions regarding the possible purchase of the business. In May of 1980 the parties signed an agreement pertaining to the purchase. By its terms, Wightman agreed to assume $150,000.00 on the principle of the existing Reiten, Inc.'s SBA loans and in exchange would receive a like amount of parts and other fixed assets not including whole goods (complete machines). The whole goods were to remain on the sales lot in the name of Reiten, Inc., and Wightman was to use his best efforts to sell these goods with the proceeds going towards retirement of the SBA indebtedness. Wightman was to form a new corporation, West Fargo Implement, Inc., who would in essence carry on the old farm equipment dealership of Reiten, Inc. at the same location by leasing the premises from Reitens. Reiten himself was to remain with the new company as a commissioned salesman. It was contemplated that Wightman would make an initial payment to SBA of $20,000.00 by June 1, 1980. The entire agreement was contingent upon Wightman assuming the outstanding SBA loan. On May 29, 1980, a three-year lease was entered into by the parties for the premises as prescribed by the agreement.

In May of 1980, Wightman formed a new corporation known as West Fargo Implement, Inc. and on May 15, 1980, commenced operation of the former Reiten, Inc. dealership under that name. Reiten himself remained at the premises on a regular basis and former Reiten, Inc. employees, Jim

Stegman and Kirk Reiten, remained as salesmen with the operation.

Wightman and his wife, on June 1, 1980, did sign a personal guarantee of the SBA loan, but the SBA loan was in fact never assumed by West Fargo Implement, Inc. or Wightman. Reiten had no conversations at all with SBA personnel regarding this assumption, leaving the negotiations to Wightman. Both Wightman and his father met with SBA officials and discussed assumption with Wightman, Sr. as co-signor. The signed guarantee and a board of directors resolution were prepared on SBA official forms. It is unclear as to exactly what transpired with respect to the SBA assumption, but apparently the impending financial difficulties of Reiten, Inc., which resulted in bankruptcy, where a factor both to Wightman and the SBA. Wightman testified that negotiations were in progress through July of 1980 when the Reiten, Inc. bankruptcy petition was filed. Thereafter, there were no further efforts to assume the loan. Schedule A–2 of Reiten, Inc. reflects an indebtedness to SBA of $380,000.00. Despite the lack of an assumption agreement, Wightman, via West Fargo Implement, Inc., did send the SBA a check in the amount of $6,640.00 on July 14. According to Reiten's testimony, other checks to SBA totalling $12,000.00 bounced. No other proof on this point was offered. Almost immediately West Fargo Implement, Inc. began to experience severe financial problems of its own culminating in a bankruptcy petition being filed on June 30, 1981. Wightman personally filed for relief on the same date.

2. During his employment with Reiten, Inc. as its bookkeeper and later its manager, Wightman was in charge of ordering parts and supplies from various equipment suppliers. Reiten, Inc. was on a cash basis and, according to Wightman, a check would be written in an amount large enough to cover more than one COD purchase. The checks would be cashed and the cash turned over to Kirk Reiten who in turn would use it for paying for incoming parts. This method was irregular and according to Reiten was contrary to what he was famil-

iar with. Testimony of Donald Jemtrud, a CPA, established that between December 1978 and November 1979 Wightman wrote and endorsed checks for one amount but posted them to the check register at a smaller amount. The discrepancy totalled $6,000.00 which Wightman contends was used for parts as was the practice with the books being later reconciled. No cash entries were ever made in the register. Reiten asserts that $6,000.00 was actually pocketed by Wightman and constitutes embezzlement.

3. As provided by the sale agreement, a substantial inventory of Reiten, Inc.'s whole goods were left on the dealership premises with Wightman understanding that he and the salesmen would use their best efforts to sell the goods. Much of these goods consisted of equipment that had been on the lot in excess of five (5) years. The exact extent in value of the whole goods at the time Wightman took over is undetermined. No written inventory was taken at the time nor was one taken in October of 1980 when the remaining whole goods were repossessed by Reiten. An inventory, or more accurately, a list of whole goods that were missing from the lot was made by Reiten in preparation for trial. This list was prepared in part from Reiten's personal recollection of what items were left on the lot. It reflects that equipment having a total value of $87,152.00 was missing. No evidence as to the value, age or condition of this equipment was offered except the values listed by Reiten himself.

The records of West Fargo Implement, Inc. established that between April and September 1980 certain of this equipment was sold either by Reiten, Inc. or West Fargo Implement, Inc. Six of the sales invoices indicate the sale to have been made by Jim Stegman. Only one bears the signature of Wightman himself who testified he was not directly involved in most of the transactions. Other than the whole goods which may be traced by virtue of sales invoices, there was no evidence as to what became of the balance of the whole goods which were apparently missing from the

lot. Reiten himself testified that he did not know where the property went. So, it is unclear what became of the sale proceeds except for $6,640.00 which was paid to SBA. Despite some testimony to the contrary, there was no specific requirement that Wightman segregate the whole goods proceeds or periodically surrender these proceeds to either Reiten or Reiten, Inc. Nor was there any requirement that Wightman maintain separate books regarding the whole goods inventory.

Reiten's position is that the proceeds of all sold whole goods plus whole goods not accounted for were misappropriated by Wightman to his own use in contravention of section 523(a)(6).

4. On June 24, 1980, an Allis-Chalmers retail installment contract was prepared showing a sale of four (4) pieces of equipment by Reiten, Inc. to James Stegman. The document bore the purported signatures of James Stegman as buyer and Reiten Equipment by Donald Reiten, President, as seller. Reiten testified he did not sign the document, and Wightman testified he did not fill it out or even participate in the sale. His testimony was further that West Fargo Implement never received any of the proceeds if there were any. Allis-Chalmers purchased this contract for $30,000.00, and this amount apparently then showed up on an Allis-Chalmers monthly statement to Reiten, Inc. Reiten contends that this amount was then charged against Reiten, Inc.'s dealer reserve. Precisely what became of the Allis-Chalmers check proceeds is unknown. Reiten did not offer testimony on this point but only that the result was a charge against the reserve account. There was no evidence of whether in fact Allis-Chalmers actually charged the reserve account or to what extent if any it was so charged. Reiten, Inc.'s Amended B–2 Schedule reflects a positive dealer reserve for $29,606.00 as of January 1981. The only document introduced was the contract itself. Whether the machinery was actually sold to and received by James Stegman is unclear. He did not testify. These circumstances, contends Reiten, establish that the contract was fraudulent and that the $30,-

000.00 was converted by Wightman to his own use.

5. On June 3, 1981, Allis-Chalmers Credit Corporation issued a check in the amount of $34,447.00 jointly payable to Reiten Equipment, Inc. and Sperry New-Holland in payment of a contract purchased from Reiten, Inc. In the course of normal events, this check should have been endorsed over to Sperry New-Holland. It was not. The reverse side depicts the endorsement of Reiten Equipment, Inc. by David Wightman and also the hand written endorsement of Sperry New-Holland. After endorsement, the check was run through the local account of West Fargo Implement, Inc. It is unclear what became of the proceeds thereafter. Reiten testified that the proceeds were not posted to Reiten, Inc.'s account nor were they paid over to Sperry New-Holland as far as he knows. Wightman testified he did not recall the transaction. Reiten testified that the amount was then charged against Reiten, Inc.'s positive dealer reserve. There was no evidence of whether in fact Sperry New-Holland actually charged Reiten, Inc.'s dealer reserve or to what extent if any it was so charged. No documents other than the check itself were offered. There was no testimony on the issue other than by Reiten and Wightman.

These circumstances, contends Reiten, establish that the endorsements were forged and the proceeds converted by Wightman to his own use.

## LAW

■ The Plaintiff, as the party seeking a determination of non-dischargeability, has the burden of proving by a fair preponderance of the evidence that a particular debt is non-dischargeable as falling within a specific discharge exception. *In re Bradford,* 22 B.R. 899 (Bkrtcy.W.D.Okl.1982). The term, fair preponderance, means the greater weight of convincing evidence. Bankruptcy courts have held the standard of proof as to the elements of fraud, false pretenses or actual fraud to be one of clear

and convincing evidence. *Matter of Kalinowski,* 27 B.R. 114 (Bkrtcy.M.D.Fla.), *In re Visers,* 21 B.R. 638 (Bkrtcy.E.D.Wis.1982), *In re Newmark,* 20 B.R. 842 (Bkrtcy.E.D.N.Y.1982). A companion to this proof requirement, and one which is as important to keep in mind when considering a dischargeability case, is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally in favor of a debtor so that the expressed intent of Congress may be accomplished—that is, to afford the debtor a fresh start. *In re Visers,* id., *In re Grosso,* 9 B.R. 815 (Bkrtcy.N.D.N.Y.1981). Thus, a party seeking to establish an exception to discharge by proving up a case under section 523(a) of the Code has a greater burden in bankruptcy court than it might have in any other court. For, at the outset, it is faced with the knowledge that the enumerated exceptions will be narrowly construed which as an evidentiary principle requires that any factual doubt will be strictly construed in favor of the debtor.

1. The Plaintiffs seek a determination of the non-dischargeability of a debt stemming from the $6,000.00 COD check overages on the basis that Wightman embezzled this money while acting in a fiduciary capacity. 11 U.S.C. § 523(a)(4) provides, in part:

(a) A discharge under sections 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . .

■ The traditional definition of a fiduciary is inapplicable in bankruptcy law. Implied or constructive trusts and trusts ex maleficio, that is trusts imposed because of wrongdoing on the part of a person to be charged as a trustee, are not susceptible to the establishment of a fiduciary relationship under the Code. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), *In re Cairone,* 12 B.R. 60 (Bkrtcy.D.R.I.1981). The situation before the Court is similar to the facts existing in the case of *Matter of Walker,* 7 B.R. 563 (Bkrtcy.M.D.Ga.1980) where a service station manager, while having the responsibility of collecting sale proceeds, accounting for them and thereafter depositing them, did not give rise to a fiduciary relationship and one could not be implied by contract or by the factual situation of the parties. There as here, there was no express trust in existence. In the case now before the Court, as between Wightman and Reiten, Inc., there was no written description of precisely what Wightman's responsibilities were with respect to preserving the estate of Reiten, Inc. The Court concludes that whatever relationship was between Reiten, Inc. and Wightman, it was less than what was required by the Code to give rise to fiduciary relationship.

■ Nonetheless, embezzlement under 523(a)(4) does not require the existence of a fiduciary relationship or an express trust relationship. With respect to embezzlement, the only question is whether embezzlement in fact occurred. *In re Carlton,* 26 B.R. 202 (Bkrtcy.M.D.Tenn.1982). Thus, the court does not have to find that the debtor was acting in a fiduciary capacity in order to find the debt non-dischargeable on the grounds of embezzlement. In order to establish embezzlement, the Plaintiffs must prove circumstances which would support a finding of theft under North Dakota Century Code § 12.1–23–02. That section provides,

"A person is guilty of theft if he:

1. Knowingly takes or exercises unauthorized control over, or makes an unauthorized transfer of an interest in, the property of another with intent to deprive the owner thereof;

2. Knowingly obtains the property of another by deception or by threat with intent to deprive the owner thereof, or intentionally deprives another of his property by deception or by threat; or

3. Knowingly receives, retains, or disposes of property of another which has been stolen, with intent to deprive the owner thereof."

Under federal law, embezzlement means simply the fraudulent appropriation of property by a person to whom such property has been entrusted. *Moore v. United States,* 160 U.S. 268, 16 S.Ct. 294, 40 L.Ed. 422 (1895). From the facts as outlined herein, the Court cannot conclude that embezzlement of these funds on the part of Wightman has been proved by clear preponderance of the evidence. Although the check writing practices with respect to COD purchases appeared to be irregular, that fact in and of itself does not establish that Wightman took for his own benefit any cash excess over and above the price of an individual COD delivery. It was his testimony that any balance was turned over to Kirk Reiten who then used it for subsequent COD payments. Kirk Reiten did not testify on this point, and it is conceivable that this was the practice as between Wightman and Kirk Reiten. The Plaintiffs have failed in their burden.

2. The unaccounted for whole goods proceeds and inventory, it is asserted, were in some way willfully and maliciously disposed of by Wightman which renders the value of the missing and unaccounted for items non-dischargeable pursuant to section 523(a)(6). In this regard, Wightman it is contended was required to either apply the proceeds towards the SBA indebtedness or to Reiten himself but instead utilized the funds himself. Section 523(a)(6) of the Bankruptcy Code provides, in part, as follows:

(a) A discharge under sections 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(6) For wilful and malicious injury by the debtor to another entity or to the property of another entity; . . .

Although this section does not make any specific reference to the conversion of property, courts have held that Congress intended to include within the section the wilful and malicious conversion of property. *In re Graham,* 7 B.R. 5 (Bkrtcy.D.Nev.1980). Although variously defined by different courts, the definition of conversion is generally the wrongful assumption of dominion over personal property by one person to the exclusion of possession by the owner in repudiation of the owner's rights. In order to be non-dischargeable, the conversion must be both deliberate and intentional. Malice, as used in the Code, does not require a finding of spite for malignant disposition. *In re Carlton,* supra. Facts, with respect to Wightman's disposal of the whole goods inventory, say the Plaintiffs, demonstrate an intent on the part of Wightman to wrongfully convert this equipment to his own benefit and use. The Court has several problems with this position. First of all, there was no clear understanding between the parties as to precisely what Wightman was to do with the proceeds. It is clear that he did have the authority operating as West Fargo Implement, Inc. to dispose of the whole goods in the normal course of his business. The May 1981 purchase agreement did require him to surrender proceeds to SBA but did not specify when this was to be done nor did it specify that any particular amount was to be paid over to either of the Plaintiffs. The facts further show that at least on one occasion Wightman did turn over a check in excess of $6,000.00 to the SBA. The source of this money may well have been whole goods inventory proceeds. A dark cloud looming over the entire relationship between Wightman and the Plaintiffs and only touched upon at trial was the apparently financial instability of Reiten, Inc. ultimately culminating in its bankruptcy in July of 1981, only a short time after Wightman assumed control of the dealership. Certainly this contributed to the problems Wightman may have had with the dealership and raised a question in his mind whether he ought to in fact go ahead with assumption of the SBA loans. His failure to proceed with assumption of the SBA loans and his failure to make further direct payments to the SBA was no doubt exacerbated by the financial problems of Reiten, Inc. The facts as listed at trial do not establish that Wightman exercised control over the whole goods or disposed of the proceeds intentionally and in conscious disregard of the rights of the Plaintiffs. Finally, the Court remains unconvinced with

respect to what the precise value of the missing inventory is or whether inventory that was sold was sold at less than fair market value. The testimony was that most of the remaining whole goods were in excess of five (5) years old and some portions were in excess of twenty (20) years old. Wightman's obligation was to use his best efforts in an effort to sell this inventory. He and others did effect the sale of some of the inventory at various prices. Whether or not those prices were unreasonable must be resolved in favor of the Debtor. Plaintiffs have failed by credible evidence to establish the value of the missing items or precisely to what extent they were damaged thereby. For the Court to place a precise value upon these goods would require it to engage in guess work which it will not do. Accordingly, this issue must be resolved in favor of the Debtor.

3. In order for the Plaintiffs to prevail on the theory of actual fraud with respect to the Allis-Chalmers contract and the Allis-Chalmers check, they must prove all of the elements of section 523(a)(2). If any one of the elements is absent, irrespective of how overwhelming the proof as to the others might be, the Plaintiffs may not prevail. The five (5) elements are as follows: 1) That the debtor made the representations; 2) That at the time made, the debtor knew they were false; 3) That the representations were made with the intention and purpose of deceiving the creditor; 4) That the creditor relied on such representations; and 5) That the creditor sustained the alleged loss and damage as the proximate result of the representations having been made. *Re Houtman,* 568 F.2d 651 (9th Cir.1978); *In re Visers,* supra; *Re Pommerer,* 10 B.R. 935 (Bkrtcy.D.C.Minn.1981). Regardless of whether the Debtor's action is characterized as a false pretense or actual fraud, the essence of the action is deception and that deception need not be expressed in words. A person's intent is often incapable of direct proof, but it may be inferred from the totality of circumstances surrounding a transaction. *Re Pommerer,* id. Likewise, fraud itself may be implied from the circumstances if those circumstances present a

clear showing of deceptive conduct on a part of the debtor which indicates an intent on his part to cheat and deceive. *In re Diaz DeVillegas,* 26 B.R. 600 (Bkrtcy.S.D.Fla. 1983); *In re Holcombe,* 23 B.R. 590 (Bkrtcy. E.D.Tenn.1982).

The facts are incomplete regarding the Allis-Chalmers contract. The evidence is sufficient to establish that Reiten did not prepare the contract, but that fact is not enough to establish by a process of elimination that Wightman did. June of 1980 was a transition period for all parties, and during that month former salesmen of Reiten, Inc. remained on the sales lot, one of them being James Stegman, the very person named as buyer. Wightman was not the only individual who had the ability to prepare such a contract nor the only one who could have sold it to Allis-Chalmers Credit Corporation. Wightman denied preparing it and also denied receiving any of the proceeds. Proof that he did these things was not clear and convincing. Admittedly, he was in a position to do them but from the facts before it, the Court cannot conclude that he was the one who concocted the false document. The evidence is also insufficient with respect to damages. Reiten testified that Wightman took the proceeds and thereafter Reiten, Inc.'s reserve account was charged. The Court cannot, from the facts available, conclude that Wightman received the proceeds or that in fact Reiten, Inc.'s reserve account was charged. No evidence other than Reiten's testimony was offered on these points. Presumably, there existed documents which would establish the reserve charge since Reiten, Inc., for purposes of its bankruptcy schedules, was able to come up with a definite reserve balance of $29,606.00.

As for the $34,447.00 Allis-Chalmers check, a problem of proof also exists with respect to the extent of the damages if any. The Court is satisfied that the endorsements of Reiten, Inc. and Sperry New-Holland were made by Wightman, but what became of the proceeds is again unclear. Reiten claims the funds found their way

**254**

into the pocket of Wightman with a resulting charge against Reiten, Inc.'s reserve account. The proof of these points is insufficient. Finally, it is unclear that Wightman, even if he did deposit the Allis-Chalmers check proceeds into the West Fargo Implement account, did so with the purpose of deceiving the Plaintiffs. In May he had assumed full operation of the former Reiten, Inc.'s dealership, and by the terms of the purchase agreement he was to become the new Allis-Chalmers dealer in the area. He may well have been within his rights to assume control over the proceeds since the agreement does not provide him with any indication of what is to be done with such incoming checks.

The Plaintiffs' burden of proof with respect to each element of their cause of action must be measured by the standard of clear and convincing evidence. The Court has not been pursuaded by clear and convincing proof that the Plaintiffs established the requisite elements necessary under sections 523(a)(4), 523(a)(6) or 523(a)(2). Therefore, and for the reasons set forth herein, it is the decision of the Court that the Plaintiffs' complaint be dismissed and any debts which might be due to the Plaintiffs stemming from the facts as set forth herein are discharged. Each party shall bear its own costs, disbursements and attorney's fees.