In re CHOISNARD, Pierre & Bonnie, Debtors.

Mills R. COLEMAN and Kay Kelley, Plaintiffs,

v.

Pierre Bruno CHOISNARD, Defendant.

Bankruptcy No. 88–00429–C.
Adv. No. 88–0124–C.

United States Bankruptcy Court, N.D. Oklahoma.

March 17, 1989.

Novell Wilson, Tulsa, Okl., for plaintiffs.

Warren L. McConnico, Tulsa, Okl., for defendant.

## MEMORANDUM DECISION AND OPINION

STEPHEN J. COVEY, Bankruptcy Judge.

On February 7, 1989, the Court heard this adversary proceeding brought under 11 U.S.C. § 523(a)(4) and § 523(a)(6) to determine the dischargeability of a debt. After considering the evidence presented and the arguments and authorities of counsel, the Court makes the following findings of fact and conclusions of law.

In September of 1983, Kay Kelley ("Kelley") purchased the Victorian Plaza Hotel in Fort Scott, Kansas. From September of 1983 to May of 1984, Kelley invested approximately $176,000.00 to purchase and renovate the hotel. In late April or early May of 1984, Kelley was trying to raise additional money to complete restoration of

the hotel and reopen it as a business venture.

In late April or early May of 1984, Pierre Choisnard ("Choisnard") met Kelley "by coincidence" at the Victorian Plaza Hotel. During this meeting, Choisnard suggested that Kelley might raise money for the Victorian Plaza Hotel project through a limited partnership offering. Choisnard informed Kelley that he was a licensed stockbroker and knowledgeable in this area of financing. They agreed to meet again to discuss that financing option.

At approximately this time, Kelley also entered into an oral partnership agreement with Mills R. Coleman to develop and operate the Victorian Plaza Hotel. Certain terms of this partnership were later committed to writing in early June of 1984.

On May 14, 1984, Kay Kelley, as "General Partner" for the "Victorian Hotel Plaza Partnership", entered into a letter agreement with Rehoboth Securities, Inc. ("Rehoboth"). Choisnard was a shareholder, director, and the President, Secretary and Treasurer of Rehoboth. The letter agreement was signed by Choisnard as President of Rehoboth.

The agreement set forth the understanding of the parties "with respect to the proposed offering of Limited Partnership Units under Regulation D on a best-efforts basis." Pursuant to that agreement, Rehoboth was to receive a commission of 8% of all monies raised in the offering and was to be reimbursed "for all out of pocket expenses including, but not limited to legal, accounting and printing fees." The agreement also required the partnership to pay Rehoboth a retainer of $10,000.00, as follows:

> *Retainer.* As previously discussed, a non-refundable retainer of $10,000 to be paid to Rehoboth will be necessary to secure the legal and accounting services, that will be required for the offering. This sum will be applied as a credit against the total expenses to be incurred.

On June 8, 1984, at a meeting held in Rehoboth's offices, Coleman made out a check in the amount of $10,000.00 to Rehoboth Securities, Inc., as payment of the retainer under the letter agreement of May 14, 1984.

Of this $10,000.00 retainer, Rehoboth expended only $500.00 for out of pocket expenses incurred in connection with the proposed limited partnership offering to finance the Victorian Plaza Hotel project. The remainder of the money was used to meet general corporate overhead expenses or was used in connection with another limited partnership offering in which Rehoboth was engaged at the time.

By October of 1984, Rehoboth could no longer meet the minimum capitalization requirements to continue its securities business and Rehoboth resigned from membership with the NASD on October 19, 1984. Choisnard left Fort Scott, Kansas, for greener pastures; Kelley and Coleman have been seeking the return of their retainer ever since.

Choisnard filed for bankruptcy relief herein on February 23, 1988. Kelley and Coleman contend that Choisnard's debt to them for the balance of the retainer money is excepted from discharge under 11 U.S.C. § 523(a)(4) or (a)(6).

The threshold issue is whether there is a debt to Coleman and Kelley. The letter agreement states that the retainer was "non-refundable". However, in the same sentence the letter refers to previous discussions. Kelley and Coleman insist that Choisnard told them that the retainer would be refunded to the extent that the money was not used to pay expenses of the offering. Choisnard admitted at trial that, if he had determined that the offering was not feasible the day after receiving the money, he would have refunded the retainer in full. Also, in a letter to Kelley dated December 5, 1984, Choisnard (writing as President of Rehoboth) stated that "notwithstanding the 'non-refundable' clause" he intended to refund the balance of $9,500.00 not expended. Thus, the retainer was "refundable" to the extent the funds were not used for the expenses of the offering. The retainer was "non-refundable" in the sense that, regardless of whether the offering was ever actually made or

the ultimate success of the offering, the retainer money properly spent in connection with the offering would not be refunded.

Choisnard also contends that the agreement entitled Rehoboth to use the retainer not only for actual out of pocket expenses but also for general corporate purposes. However, Choisnard's letter dated December 5, 1984, and the letter agreement itself are both inconsistent with this interpretation. The letter agreement addresses only reimbursement of "out of pocket expenses". In a separate paragraph discussing "expenses", general corporate expenses are not mentioned. The Court finds that Rehoboth's 8% commission was meant to compensate Rehoboth for its services and the general corporate expenses associated with providing these services. The retainer was intended to be used only for actual out of pocket expenses incurred in connection with the offering.

Therefore, the Court finds Choisnard is indebted to Kelley and Coleman in the amount of $9,500.00 for the retainer money not used to pay actual out of pocket expenses incurred in connection with the offering.

The second issue is whether the debt is excepted from discharge under 11 U.S.C. § 523(a)(4) or (a)(6). The Court will examine each of these grounds independently.

Under § 523(a)(4), a debt is excepted from discharge if incurred (1) through fraud or defalcation while acting in a fiduciary capacity, (2) embezzlement, or (3) larceny.

■ An express or technical trust, arising by agreement or by statute prior to commission of any wrongful act, must exist between the parties to create the requisite fiduciary capacity under § 523(a)(4). *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Romero,* 535 F.2d 618 (10th Cir.1976); *In re Black,* 787 F.2d 503 (10th Cir.1986). Although the question of what constitutes fiduciary capacity is determined by federal bankruptcy law, state or other federal law

may impose a trust relationship sufficient to create fiduciary capacity for the purposes of § 523(a)(4). *Romero* at 621; *Black* at 506.

In this case, the Court must determine whether the requisite trust relationship was created between Kelley and Coleman and Rehoboth and, if so, whether Rehoboth's fiduciary capacity is imputed to Choisnard as an officer of the corporation. Plaintiff's contend that the requisite trust relationship was created either by the letter agreement or federal securities law.

■ The requisite trust relationship did not arise from the letter agreement. The elements of an express trust are (1) the intent to create a trust, (2) a clearly defined trust res, and (3) specific trust duties.[1] As previously stated, the letter agreement required Rehoboth to use the retainer money only in connection with the expenses of the limited partnership offering. However, the letter agreement did not require Rehoboth to segregate the retainer funds, and, in fact, the funds were deposited in the general corporate account and commingled with other funds. The letter agreement merely established a contract to apply $10,000.00 in a certain manner. The contract could be satisfied regardless of which actual dollars were applied to expenses or which actual dollars were refunded. The requisite intent to create a trust and clearly defined trust res are lacking to establish a trust relationship for the purposes of § 523(a)(4).

■ In the alternative, Plaintiffs' contend that, pursuant to 17 CFR 240.15c3–1(a)(2) of the Securities Exchange Act, Rehoboth was required to segregate the retainer funds, and therefore the requisite trust relationship under § 523(a)(4) was imposed by statute. This Securities Exchange Act provision governs the minimum net capital requirements for securities brokers who do not generally carry customers' accounts. It is undisputed that Rehoboth was a broker who did not generally carry customers' accounts. Such securities brokers have a lesser net capital requirement because they are not allowed to carry cus-

1. See generally G. Bogert, Trusts (6th Ed.1987).

tomer accounts and they must comply with certain other restrictions.

Pursuant to subparagraph (ii) of the above-referenced Securities Exchange Act provision, Rehoboth was prohibited from participating in an *underwriting on a best efforts basis in accordance with 17 CFR 240.15c2–4(b)(2)*, unless Rehoboth forwarded to an independent escrow agent *"customer's checks, drafts, notes or other evidences of indebtedness received in connection therewith "*.

Plaintiffs contend that they were customers of Rehoboth and their $10,000.00 check was delivered to Rehoboth in connection with the best efforts offering which Rehoboth agreed to perform. This interpretation is erroneous for two reasons.

Firstly, 17 CFR 240.15c2–4, governing payments received in connection with underwritings, only requires a securities broker to segregate funds received for the purchase price of securities, not funds for preparing the offering itself. Therefore the $10,000.00 check was not a check received "in connection with" the underwriting for the purposes of the statute requiring segregation of such funds.

Secondly, Plaintiffs were not "customers" of Rehoboth. A person is a "customer" of a broker, with regard to cash in the hands of the broker, only if the person placed the cash on deposit with the broker *for the purpose of purchasing securities or the cash was derived from sales of that person's securities.*[2] In this case, Plaintiffs deposited $10,000.00 with Rehoboth, not for the purchase of securities, but for out of pocket expenses to be incurred in the proposed limited partnership offering.

Thus, the Court finds that federal securities laws did not require Rehoboth to segregate the retainer funds and, therefore, cannot be construed to impose a trust rela-

tionship between the parties for the purposes of § 523(a)(4).[3]

Under § 523(a)(4), the Court finds that Rehoboth was not acting in a fiduciary capacity with respect to Kelley and Coleman since the requisite trust relationship did not arise between the parties either by agreement or by statute. Accordingly, the Court need not address whether Rehoboth's fiduciary capacity could be imputed to Choisnard as a corporate officer.

■■■ The Court also finds that the debt is not excepted from discharge on the grounds of embezzlement under § 523(a)(4). Embezzlement under § 523(a)(4) is the fraudulent appropriation of property *of another* by one to whom such property has been entrusted or into whose hands it has lawfully come. *In re Wallace,* 840 F.2d 762 (10th Cir.1988). As discussed above, Rehoboth had only a contractual duty to apply $10,000.00 in a certain manner; the $10,000.00 was not a separate fund entrusted to Rehoboth. The $10,000.00 became the property of Rehoboth when it was deposited in the corporation's general account. If Choisnard had embezzled any of the funds, Rehoboth would be the only party who could properly bring an action.

■■■ The Court further finds that the debt is not excepted from discharge on the grounds of larceny under § 523(a)(4). Larceny under § 523(a)(4) is the fraudulent and wrongful taking and carrying away of property of another with intent to convert such property to one's own use without consent of the owner. In this case, there was no wrongful taking or carrying away of the property. Rehoboth became entitled to the $10,000.00 pursuant to the letter agreement between the parties. Furthermore, Rehoboth intended to abide by the

---

**2.** In reaching this conclusion, the Court has construed the definition of "customer" found in 17 CFR 240.15c3–3(a)(1) of the Securities Exchange Act in the context of and in light of the definitions of "customer" found in the Securities Investor Protection Act of 1970 (15 U.S.C. § 78aaa et. seq.) and § 741 et. seq. of the Bankruptcy Code, similar acts governing stockbroker liquidations in different contexts.

**3.** Because of the Court's finding that Rehoboth was under no duty to segregate the $10,000.00, the Court need not address the issue of whether such duty arose *prior to* the wrongful act of misappropriating the funds or merely ex maleficio.

letter agreement, but was unable to do so for financial reasons.

 Finally, the Court finds that the debt is not excepted from discharge under § 523(a)(6) "for willful and malicious injury by the debtor to another entity or to the property of another entity." As noted above, the $10,000.00 lawfully became the property of Rehoboth. Accordingly, Plaintiffs cannot maintain an action under § 523(a)(6) for injury to their property.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Plaintiffs complaint under § 523(a)(4) and § 523(a)(6) be and hereby is denied, and the debt sought to be excepted from discharge is deemed dischargeable.