**In re Willis D. HOFMANN and Bonnie L. Hofmann, Debtors.**

**Harlan WERNER and Mary Werner, Plaintiffs,**

v.

**Willis D. HOFMANN and Bonnie L. Hofmann, Defendants.**

**Bankruptcy No. 91–36177.
Adv. No. 92–7030.**

United States Bankruptcy Court,
D. North Dakota.

Sept. 4, 1992.

Daniel Chapman, Bismarck, N.D., for plaintiffs.

Lawrence Kropp, Glenn Fenske, Jamestown, N.D., for debtors, defendants.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The instant adversary proceeding arises out of a complaint filed on March 16, 1992, by Harlan and Mary Werner (Werners) claiming that the Debtors, Willis and Bonnie Hofmann (Hofmanns) embezzled or converted livestock entrusted to their care. Recovery is premised upon sections 523(a)(4) and (a)(6). Previously, the Werners sued the Hofmanns in North Dakota State Court on the basis of fraud, conversion and breach of contract. That case focused on the temporary placement by the Werners of a number of their dairy cattle with the Hofmanns pursuant to a written contract which was renewed annually and remained in effect until September 1987 when the animals were to be returned. The state court determined that some of the entrusted cattle had not been returned upon contract termination and ruled against the Hofmanns on breach of contract, awarding Werners $33,247.00. The state court made no determination as to the existence of fraud or willful and malicious injury. The Hofmanns subsequently filed for relief under Chapter 7 and the instant adversary proceeding resulted by which the Werners seek to have the state court judgment declared nondischargeable.

The matter was tried on July 29, 1992, and from the evidence produced the facts, as material, and may be stated as follows:

### Findings of Fact

Harlan Werner and Willis Hofmann, both farmers, in 1982 embarked upon a relationship by which Harlan would lease dairy cattle to Willis. In evidence are a series of six cattle lease agreements for the years 1982 through 1987. Each of them provides for the placement of a specific number of Holstein cows with the Hofmanns who were to be responsible for their care and their ultimate return to the Werners at the end of each yearly lease term. The 1982 contract provides for the placement of 35 cows and the 1983 contract specified 50 cows. The contracts for the succeeding four years provided for the placement of "up to 85 head" and increased the rental from $10.00 to $20.00 per head per month with the payment made through milk assignments. In the years 1984, 1985, 1986, and 1987, the Werners were to receive 70% of that year's calf crop with the express agreement that should a calf die before reaching 400 lbs. it could not be included in the calculation.[1] All contracts make the Hofmanns liable for all deaths and in such event, require them to either replace the animals or pay the Werners $1,000.00.

In the 1986 contract there is a statement that the Hofmanns owe the Werners 26 head of mixed calves born out of the 1985 cow placement. The 1987 contract states that the Hofmanns have in their possession 13 first calf heifers born of the 1985 placement and these 13 are to be included in the 85 head placed in 1987. The 1987 contract further states that the Hofmanns owe the Werners 12 head of mixed calves and 4 yearlings, all born of the 1985 cow placement.

The parties had a falling out and in September 1987 the Werners terminated the agreement. They went out to the Hofmanns' place and loaded up the remaining cows and calves. According to Harlan, he loaded 46 cows and 21 calves. His wife testified that 22 calves were recovered. The Hofmanns, on the other hand, recall that the Werners recovered 48 cows and 22 calves.

In addition to managing the Werners' cattle, Hofmanns apparently had over the years acquired animals of their own and after the Werners' recovery, the Hofmanns say they were left with 26 Holsteins of their own. There was no independent cattle inventory done at the time of the Werners' recovery and thus no evidence of what the actual numbers were exists save for the parties' own statements which are not particularly reliable.

With the Hofmanns and Werners unable to agree on how many animals were recovered, it is not surprising that they should be in dispute over how many animals were placed with the Hofmanns over the contract years and how many should have remained in the Hofmanns' possession in September 1987. Cattle count discrepancies precipitated a state court lawsuit in which the Werners sought recovery for all cattle they believed to be missing. Recovery was sought under the dual theories of breach of contract and conversion. Trial was held before the Honorable Gordon O. Hoberg, Judge of the District Court for Stutsman County, North Dakota in December 1990. After taking evidence, Judge Hoberg made specific findings relative to the numbers of cattle placed and the numbers remaining in September 1987. He concluded that the Werners had 60 cows placed with the Hofmanns in 1987, that 8 died through no negligence and 48 were returned leaving 4 unaccounted for at $1,000.00 per head. Eight thousand dollars was also awarded for 8 dead cows. Judge Hoberg concluded, based on the 1987 contract, that the Hofmanns had or should have had 13 unbranded first calf Holsteins worth $900.00 per head for a total of $11,-700.00. The 1987 contract specified that 12 head of mixed calves and 4 yearling Holsteins were to be in the Hofmanns' posses-

---

1. Although the 1982 and 1983 contracts contain no express language, the parties apparently intended that the Hofmanns would retain 50% of the 1982 calf crop and 30% of the 1983 calf crop.

sion. Judge Hoberg found these also to have been missing in September 1987 and awarded the Werners $6,000.00 for the 12 head (@ $500.00) and $2,400.00 for the yearlings (@ $600.00). They were also awarded $312.00 as the balance remaining due on a contract specified $912.00 debt. Together with taxed costs and disbursements the total judgment was $33,247.00.

The state court judgment was rendered based solely upon the breach of contract theory without any determination as regards the allegation of conversion.

The 1987 herd deficiency can be arrived at only by back tracing to 1982 the new cows annually placed with the Hofmanns coupled with the annual calf crop, and adjusting these figures for deaths, cow and calf returns to the Werners and offsets in recognition of the Hofmanns' share of the calf crop.

Although the contracts themselves refer to a specific number of cows to be placed each year, in fact the cows in the Hofmanns' possession in years subsequent to 1982 in part included holdovers from the prior year's placement. Both parties maintained separate records on what they regarded as accurate livestock numbers but neither can be taken as wholly conclusive. The records differ in the number of cows delivered annually, the numbers that were delivered pregnant, the numbers that were returned pregnant, the numbers held over from year to year, the number of calves born and the number of calves annually returned to the Werners. Harlan concedes that at least one cow delivered had mastitis and that none of the cows were pregnancy tested. His wife, while professing to have maintained an accurate record, conceded that she made no personal count and in recording the numbers delivered, simply put down the numbers called for in the contracts. On cross examination she agreed her numbers could be off as much as 3 cows for each succeeding year. On the question of pregnant cows, Harlan himself said that he was not sure how many cows were returned to him pregnant but agreed, under the contract, the Hofmanns would have been entitled to a percentage.

The Hofmanns insist that according to their records by which they trace the six year cow placements, births, deaths and returns, that in September 1987, the Werners received all cows and calves belonging to them which remained in their possession and in fact received 15 calves more than they were entitled to under the 70/30 share arrangement. In contravention of the Hofmanns' final tally, however, is the 1986 contract provision specifying a 26 head calf holdover from 1985 belonging to the Werners and the 1987 contract specifying a 13 head holdover from 1985, a 12 head mixed calf holdover and a 4 head yearling holdover. The Hofmanns testified that these animals never existed and that he so advised the Werners but that the Werners and their banker insisted the 1987 contract show 16 mixed calf and yearlings anyway with the understanding that later in the production year when the calves were actually born they would be turned over to the Werners. Likewise, as for the 13 head holdover, the Hofmanns said they didn't actually exist in 1987 but were referenced in the contract because they were short 13 calves from a prior year. This assertion does not appear to be surprising in view of the fact that in prior years the calf crop was distributed in fairly haphazard ways at variance with the contract terms. For example, in 1983 there were 37 calves born and 37 turned over to the Werners despite an agreement that the Hofmanns would receive 50% of the production; in 1984 the Werners picked up 33 calves of the 52 head born, leaving 3 of theirs with the Hofmanns. Similarly, in 1985 the Werners left 4 of their share numbers with the Hofmanns but in both 1986 and 1987 they received numbers in excess of their share.

Independent of the lease contracts, in September 1987, the parties had discussions concerning the outright purchase by the Hofmanns of some of the Werners' cattle in his possession. This agreement was never executed but apparently led to a dispute with the Werners' banker over actual cow and calf numbers in existence and after a trip to the Hofmann place, the bank insisted that the Werners recover their animals and end the leasing arrangement.

Whereupon the 1987 agreement was abruptly terminated, the Werners collected their animals, brought suit against the Hofmanns for perceived deficiencies and the Hofmanns on December 12, 1991, filed for relief under Chapter 7.

### Conclusions of Law

■ Before discussing the elements essential to recovery under section 523(a)(4) and (a)(6), it is necessary to remind the parties that this court does not sit in appellate review of Judge Hoberg's determination. His decision is *res judicata* as regards the number of cows missing and the state court judgment is regarded as conclusive of the amount of the indebtedness outstanding and which is sought to be found nondischargeable by these proceedings. Hence, the only issue with which this court is concerned is whether the evidence is sufficient to find the debt of $33,247.00 nondischargeable under either of the section 523 sections.

■ The exceptions to discharge are construed narrowly with the burden of proof being placed upon the party opposing the discharge. *In re Belfry*, 862 F.2d 661 (8th Cir.1988). As the United States Supreme Court has established, the "standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence." *Grogan v. Garner*, — U.S. —, —, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). The two relevant sections in the instant case are sections 523(a)(4) and (a)(6) which provide:

> A discharge under section 727 ... does not discharge an individual debtor from any debt—
>
> > (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny ...
> >
> > (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(4), (a)(6).

#### 1.

To show that their claim against the Hofmanns should be excepted from discharge under section 523(a)(4), the Werners must show by a preponderance of the evidence that a fiduciary relationship exists between the parties and that the Hofmanns are guilty of defalcation or fraud while acting as a fiduciary, or that embezzlement or larceny exist.

■ This court previously ruled that the traditional use of the term, fiduciary, is inapplicable in bankruptcy law and concluded that the fiduciary capacity requirement has been limited to express or technical trusts and not constructive trusts arising out of the act of wrongdoing itself. *In re Wightman*, 36 B.R. 246, 251 (Bankr.D.N.D. 1984) (Citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934)); *see, e.g., In re Henson* 135 B.R. 346 (Bankr.E.D.Ark.1991). Generally, an express trust is created by an agreement between two parties to impose a trust relationship. *In re Marchiando*, 138 B.R. 548 at 552 (Bankr.N.D.Ill.1992). The typical characteristics of an express trust generally include an explicit declaration of a trust with a trust *res*, and an intent to create a trust relationship. *Id.* The agreement entered between the Werners and Hofmanns lack the essential elements necessary of a trust. Said agreements plainly failed to manifest the existence of a trust; the intent to create a trust was also lacking. *See F.P.P. Enterprises v. U.S.*, 830 F.2d 114 (8th Cir.1987); *Warner v. First Nat'l Bank of Minneapolis*, 236 F.2d 853 (8th Cir. 1956). Some courts have even acknowledged the existence of a technical trust where a statute imposes fiduciary obligations on a party. *E.g., In re Janikowski*, 60 B.R. 784, 789 (Bankr.N.D.Ill.1986). A contractual relationship, however, arising out of an agreement between two parties where one party would care for certain cattle in exchange for a share of the milk proceeds and a percentage of the annual calf production does not in itself create the required express trust or any other type of trust. *See Marchiando, supra* (citing to *Harasymiw v. Selfreliance Fed. Credit Union*, 97 B.R. 924, 926 (N.D.Ill.1989), *aff'd*, 895 F.2d 1170 (7th Cir.1990)). The relationship between the Werners and Hofmanns is merely a contractual relationship

and does not give rise to a fiduciary relationship. Such a relationship is less than what is required to establish the existence of a fiduciary relationship. Where no fiduciary relationship exists, no fraud or defalcation can arise from the nonexisting fiduciary relationship as mandated under section 523(a)(4).

■ Notwithstanding the lack of fiduciary duty, the Hofmanns' obligation to the Werners may still be dischargeable under the theory of embezzlement and larceny. Embezzlement and larceny under section 523(a)(4) does not require the presence of a fiduciary relationship or an express trust relationship. *Wightman*, 36 B.R. at 251. Embezzlement is the fraudulent appropriation of property by a person to whom such property had been lawfully entrusted or into whose hands it has lawfully come. *Moore v. United States*, 160 U.S. 268, 16 S.Ct. 294, 40 L.Ed. 422 (1985); *In re Phillips*, 882 F.2d 302, 304 (8th Cir.1989); *In re Belfry*, 862 F.2d 661, 662 (8th Cir.1988).

■ The Eighth Circuit stated that "[o]bligations sufficient to support a claim of embezzlement are ones which make the debtor's discretionary use of the [cattle], prior to complying with the obligations, improper." *Belfry*, 862 F.2d at 663. The court also noted that "terms which manifest nothing more than the 'hope that no problem will ensue after a carefully and skillfully negotiated agreement is set forth in a legally enforceable contract,' [citation omitted], will not support a claim of embezzlement." *Id.* In the instant case, pursuant to the cattle lease agreements, the Hofmanns were to care for the Holstein cows placed with them and ultimately return the cattle back to the Werners at the end of each yearly lease term. This court does not believe that embezzlement exists nor is it proper to automatically assume embezzlement occurred merely because certain cows were missing. Rather, this court finds that the fundamental disagreement over the cow and calf numbers was a consequence of many years of inaccurate cattle herd counts and the lack of independent herd inventory taken throughout the duration of the lease agreements. The Werners

and Hofmanns were quite flexible in their dealings with each other and were not particularly careful in adhering to the precise language of the respective contracts which resulted in the discrepancy as to the number of animals recovered from and placed with the Hofmanns and the number of holdover cattle from year to year. The circumstances surrounding this case are no different than any other contractual relationships—each party hopes and expects that no problems would arise. Unfortunately, the hopes and expectations of the Werners were not met, not because of embezzlement, but simply because of the noncompliance to the specific contractual terms. Hence, in the case at bar, there is no embezzlement, but rather a dischargeable breach of contract. *See Id.*

■ The court further finds that the debt is not excepted from discharge on the grounds of larceny under section 523(a)(4). Larceny is the wrongful taking and carrying away of property of another with intent to convert said property to one's use without the consent of the owner. *In re Heath*, 114 B.R. 310 (Bankr.N.D.Ga.1990); *Matter of Burgess*, 106 B.R. 612 (Bankr.D.Neb. 1989); *In re Choisnard*, 98 B.R. 37 (Bankr. N.D.Okla.1989). Here, the court finds that the Hofmanns did not commit larceny with respect to the missing cattle. Embezzlement focuses on the lawful or authorized possession of another's property whereas larceny involves the original unlawful taking or carrying away of the property. As the court discussed earlier, the procurement of the cattle by the Hofmanns was lawfully derived from the lease agreements entered between the Hofmanns and the Werners. Consequently, because the Hofmanns' original taking and possession of the cattle were lawful, the Hofmanns did not commit larceny under the confines of section 523(a)(4).

2.

■ The Werners further contend that the missing cattle were in some way willfully and maliciously disposed of by Hofmann which renders the state court judgment for compensation of the unaccounted

and missing cattle nondischargeable pursuant to section 523(a)(6). This court in *Wightman* recognized that despite section 523(a)(6)'s failure to make mention of the conversion of property, "Congress intended to include within [section 523(a)(6)] the willful and malicious conversion of property." 36 B.R. at 252; *In re Long* 774 F.2d 875, 879 (8th Cir.1985). In *Long* this Circuit explained that the terms willful and malice cannot be lumped together as they have two separate and different meanings. 774 F.2d at 881. Willful means "headstrong and knowing;" malicious means "targeted at the creditor." *Id.* Hence, the Hofmanns' alleged conversion of cattle must be deliberate or intentional and that their conduct is certain or almost certain to cause the Werners financial harm. Otherwise, the debt owing to them is amenable to discharge.

In the instant case, the court does not believe that the Hofmanns' conduct establishes willful nor malicious conversion of property, but rather epitomizes the confusion and nonchalant manner the Hofmanns and Werners each had concerning their respective obligations. As the facts indicate, the cattle count discrepancies persisted because of the parties' failure to accurately account for the number of cows; their failure to obtain unbiased independent records of the cattle inventory; and their carelessness adhering to the contractual terms. This inattentiveness shown by both parties is exemplified when the Werners received all 37 newly born calves in 1983 when the agreement specifically provided that the Hofmanns would receive 50% of said calves. On other occasions, the Werners left several of their share of calves with the Hofmanns while receiving more than their allotted share in other situations. The rather abrupt termination of the contract in 1987 further contributed to many of the difficulties experienced by the parties since they, as in the past, might well have continued on into 1988 with any 1987 deficiency being held over into 1988 as had been their past practice.

It is this court's opinion that there is simply insufficient proof to establish that the missing and unaccounted cattle were the result of the Hofmanns' deliberate intent to deceive or cause the Werners financial harm, but simply the result of sloppy inventory records, and a flexible, but not particularly practical, business relationship.

Accordingly, for the foregoing reasons, IT IS ORDERED that the debt owed by the Defendants, Willis and Bonnie Hofmann, to the Plaintiffs, Harlan and Mary Werner, is dischargeable.

SO ORDERED.

LET JUDGMENT BE ENTERED ACCORDINGLY.