**In re Kenneth P. DECKER, Debtor.**

**DAN PORTER MOTORS, INC., Plaintiff,**

v.

**Kenneth P. DECKER, a/k/a
Ken Decker, Defendant.**

**Bankruptcy No. 92–30933.
Adv. No. 92–7093.**

United States Bankruptcy Court,
D. North Dakota.

April 27, 1993.

Michael Maus, Dickinson, ND, for plaintiff.

David Senn, Dickinson, ND, for defendant.

*MEMORANDUM AND ORDER*

WILLIAM A. HILL, Bankruptcy Judge.

The Plaintiff, Dan Porter Motors, Inc. (DPM) commenced the instant action predicated upon sections 523(a)(2)(A), (a)(4) and 523(a)(6) of the United States Bankruptcy Code. By Complaint filed December 21, 1992, DPM alleges that the Debtor/Defendant, Kenneth P. Decker (Decker), involved DPM in the recourse financing of an existing bank loan by false pretenses and subsequently, caused willful and malicious injury to property pledged to DPM as collateral.

Trial was held on April 7, 1993, and from the evidence produced together with a limited stipulation of facts, the court finds the following as facts material to resolution of this case.

*Findings of Fact*

For many years Decker worked as an automobile salesman for DPM and when he wasn't working he engaged in the hobby of modified stock car racing—a sport which, while no doubt interesting, was also expensive for him. In March 1991, Decker purchased a 1991 Chevrolet "Wissota" modified race car for $7,500.00. The car was incomplete in that it had no engine, transmission, rear end or tires. These items were added by Decker to make it race-ready for commencement of the 1991 racing season.

Decker had outstanding loans with Liberty National Bank which wanted those loans paid off. This led to Decker approaching his employer, DPM, about taking up the debt through a recourse loan. The owner of DPM and its other employees were supportive of Decker's racing and DPM was even a sponsor. However, the dealership itself did not sell, service or finance cars of this type and neither the owner, business manager or sales manager were familiar with values of race cars. The 1991 Chevrolet race car, in complete race-ready condition, had been observed at the DPM lot and at the race track by various DPM officers and they were familiar with it in a general way.

In June 1991, Decker asked DPM's business manager to arrange refinancing of his existing loans, offering as security the 1991 Chevrolet race car along with a 1979 El Camino. The business manager assumed the 1991 Chevrolet race car was complete and in the condition observed at the track. ' Indeed it was—for Decker testified that when he approached DPM the 1991 Chevrolet race car was complete which, one can assume, included engine, transmission, suspension, steering column, steering wheel, gauges, seat, racing tires and rear end. Such equipment, according to the testimony of an experienced racing promoter, is the, "stuff normally considered part of a race car".

Knowing nothing of its value, and placing reliance upon Decker's long experience and his long time status as an employee, the business manager asked Decker what the value of the 1991 race car was. He told her it was $13,000.00. The business manager spoke to the dealership's owner, and relying upon what Decker told them, DPM agreed to arrange refinancing through Community First National Bank in the sum of $13,608.56.

A retail installment contract with the bank was signed on June 11, 1991, subject to full dealer recourse in the event of default. As security, Decker pledged the 1991 Chevrolet race car and the 1979 El Camino.

The 1991 Chevrolet race car was raced during the 1991 season and, as is normal, went through several engines, transmissions and related accessories. It is agreed that racing is hard on a car and it is common for a race car to lose one-half of its value after two years due to normal wear and tear. This particular car, however, suffered something beyond normal wear and tear for, when it was later recovered by DPM it had no engine, no transmission, no racing wheels or tires, no power steering, steering column or steering wheel, no gauges or switches, no drive shaft, no brake pedals or cylinders, no seat or belts.

Decker defaulted on his obligation to Community First causing the bank to demand payment from DPM under the re-

course agreement. On December 1, 1992, DPM paid off the loan balance of $10,791.63 and recovered the El Camino and the now incomplete 1991 Chevrolet race car. The El Camino was sold off of DPM's lot for $790.54 and the 1991 Chevrolet race car was sold for $825.00 which was the best bid received after being advertised. These sums coupled with a $2,410.00 refund from Liberty Bank left DPM with a deficiency of $6,766.09.

Subsequently, DPM's sales manager investigated the value of the 1991 Chevrolet race car and believes that if complete it would have been worth $7,500.00 at time of recovery. The race promoter who testified at trial agreed saying that such a car after several years of racing would be worth $3,000.00 to $7,500.00 if complete. But if not complete it would be worth considerably less. (This of course is assuming it was worth at least $13,000.00 in the first place.) In explaining what transpired as regards the missing items, Decker stated that he went through what engines he had and that the other missing components belonged to other people and were returned to them. He professed that even the tires, wheels, power steering pump and seats were owned by others. Nevertheless, he testified that DPM recovered precisely what it was given as collateral less normal wear and tear. What is uncertain from the evidence is whether these borrowed components were incorporated into the car at the time the security interest was given with Decker's assurances that the car was worth $13,000.00, or whether as originally completed, the car was built completely with components owned by him only later to be replaced with borrowed items. The difference is a sort of catch 22 distinction as will be later discussed. According to Decker, to put together a car like this, that is race-complete, would cost at least $7,500.00, an amount he did not have by the time it was returned to DPM.

### Conclusions of Law

#### 1.

█ DPM posits that Decker, because of his knowledge of race cars and his status as a long time employee, acted in a fiduciary capacity with regards to representing the value of the 1991 Chevrolet Wissota. This court has previously ruled that the traditional use of the term, fiduciary, is inapplicable in bankruptcy law and concluded that the fiduciary capacity requirement has been limited to express or technical trusts and not constructive trusts arising out of the wrongful act itself. *In re Wightman*, 36 B.R. 246, 251 (Bankr. D.N.D.1984). Generally, an express trust is created by an agreement between two parties to impose a trust relationship. *In re Marchiando*, 138 B.R. 548 (Bankr. N.D.Ill.1992). The typical characteristics of an express trust generally include an explicit declaration of a trust with a trust *res,* and an intent to create a trust relationship. There is no agreement between DPM and Decker which could be characterized as a trust agreement and the court concludes that their relationship is less than what is required to establish the existence of a fiduciary relationship. Where no fiduciary relationship exists, no fraud or defalcation can arise from the nonexisting fiduciary relationship as mandated under section 523(a)(4).

Notwithstanding the lack of fiduciary duty, Decker's obligation to DPM may yet be nondischargeable under section 523(a)(2)(A) or (a)(6).

#### 2.

█ Whether premising recovery upon section 523(a)(2)(A) or (a)(6), the burden rests with the Plaintiff to establish each of the respective elements by a fair preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 289, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). The two relevant Code sections provide:

a. A discharge under section 727 ... does not discharge an individual debtor from any debt— ...

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a

statement respecting the debtor's or an insider's financial condition;

.    .    .    .    .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity; . . . .

11 U.S.C. § 523(a)(2)(A), (a)(6).

For a debt to be excepted from discharge under section 523(a)(2)(A), the funds themselves must have been obtained by fraud in the inception. *In re Maranzino*, 67 B.R. 394, 397 (Bankr.D.Kan.1986). The focus then is not upon what became of the race car and its value subsequent to June 11, 1991, but rather, what representations were made by Decker at that time, their veracity and effect. To succeed in a section 523(a)(2)(A) claim, a creditor must approve each of the following elements:

(1) that the debtor made false representations;

(2) that at the time made, the debtor knew them to be false;

(3) that their representations were made with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on the representations;

(5) that the creditor sustained the alleged injury as a proximate result of the representations having been made.

*In re Ophaug*, 827 F.2d 340 (8th Cir.1987); *In re Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987).

■ First of all, the court has no difficulty concluding that DPM assisted in the refinancing by virtue of assurances by Decker that he was putting up collateral worth $13,000.00, consisting primarily of a 1991 Chevrolet Wissota modified race car— a car which DPM was led to believe was complete, that is, race ready. Likewise, the court has no difficulty concluding that the loss sustained by DPM was in consequence of it entering into this refinancing arrangement with Decker. The element of intent to deceive is always more difficult because direct proof of one's state of mind is all but impossible. Intent may, however, be inferred from surrounding circumstances. Decker, a person long involved in racing enjoyed the confidence of DPM, his employer, and was in a position to influence the company's judgment in a most disarming way. Trusting his expertise and having no ready source from which to obtain other estimates of value, and indeed having no reason to, DPM relied upon Decker's estimate of value. Decker was unable to obtain financing from other sources and was being dunned for a payoff by his existing lender. He thus had ample motivation to pursue refinancing through DPM. The problem, however, is ascertaining just exactly what false representations were made and this leads into a discussion of the car's value and component composition. While Decker testified that the race car was complete and was worth $13,-000.00, the testimony is inconclusive as to whether these statements were false at the time of loan inception. The car may well have been worth $13,000.00 for as Decker stated, he paid $7,500.00 for the car in incomplete condition and prepared it for racing by adding various components. The cost of these additional components is approximately $7,500.00 according to Decker which would have brought the car's completed value to approximately $15,000.00— a value which was not controverted at trial. The deception comes in when one attempts to ascertain just exactly who owned the component parts installed in the incomplete race car. DPM had every right to assume it was being offered a security interest in a complete race car including, "stuff normally considered part of a race car". If the component items such as engine, tires, etc., that were later removed were not owned by Decker in the first place, then he intentionally misled DPM by omitting this relevant information thereby causing DPM to back a $13,000.00 loan on a car worth considerably less.

■ If, however, the car was completed with parts originally owned by Decker but later removed or replaced with non-owned parts, then Decker violated the terms of the security agreement, his plea of normal wear and tear, notwithstanding. The security agreement required that the

car be kept in good condition and repair which this court concludes meant race ready. Here we get into section 523(a)(6) which renders a debt nondischargeable if property pledged as collateral is willfully and maliciously destroyed, converted or otherwise injured. In this circuit the term willful means "headstrong and knowing", malicious means "targeted at the creditor". *In re Long*, 774 F.2d 875, 879 (8th Cir. 1985). The removal or destruction of property subject to a security interest without payment of the debt secured thereby may constitute a willful and malicious injury satisfying the requirements of section 523(a)(6). Willfulness or a willful state of mind is demonstrated by evidence that the debtor acted deliberately and intentionally as opposed to merely negligently or recklessly. *In re Miera*, 926 F.2d 741 (8th Cir.1991). Malice is defined in the cited cases as a heightened level of conduct which by its nature is certain or almost certain to cause harm and which is targeted at the creditor. *In re Long, supra*, 774 F.2d at 881.

 Here the statement by Decker that he returned to DPM precisely what it was given as collateral places him in an awkward catch 22 situation. If in his mind, "collateral" meant the stripped chassis sans engine and other related components then he intentionally misled DPM at loan inception into thinking it was getting a security interest in a complete race car worth $13,000.00. If, on the other hand, the car was complete at loan inception, DPM, per its security interest had a reasonable expectation that it would remain so. Decker's supposition that removal of virtually every component part is normal "wear and tear" is incredulous to say the least. The court is satisfied that DPM has shown by a fair preponderance of the evidence that Decker either intentionally misled it at loan inception as to the nature and value of the 1991 Chevrolet race car or, subsequent to obtaining the loan, Decker willfully and maliciously and in complete disregard for DPM security's interest, stripped the car of component parts given as collateral with the effect of significantly reducing the car's value. Either way, the Plaintiff, DPM, is entitled to the relief prayed for.

Accordingly, and for the reasons stated, the deficiency balance of $6,766.09 plus interest owing to the Plaintiff, Dan Porter Motors, Inc., is nondischargeable and judgment may be entered in favor of the Plaintiff, Dan Porter Motors, Inc., and against the Defendant/Debtor, Kenneth P. Decker, in this sum.

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

**SO ORDERED.**